[No. 25258-5-I. Division One. July 15, 1991.]

STEPHEN F. OLMSTEAD, *Appellant,* v. THE DEPARTMENT OF HEALTH, MEDICAL SECTION, *Respondent.*

*Lawrence R. Mills,* for appellant.

*Kenneth O. Eikenberry, Attorney General,* and *Beverly Norwood Goetz, Assistant,* for respondent.

BAKER, J.—Stephen F. Olmstead, M.D., appeals the decision of the Washington Medical Disciplinary Board (the Board) to suspend his license to practice medicine. We reverse.

Dr. Olmstead is a skilled and respected cardiologist. In 1987 he began to use morphine, which he obtained at the University of Washington Medical Center by exchanging tubexes containing saline for those containing morphine left over at the end of a procedure. A tubex is a syringe with a needle attached to a glass cylinder. When his use of morphine was discovered, Dr. Olmstead signed a statement in September 1987 admitting that he had used morphine for approximately 1 year.[1]

At the same time, Dr. Olmstead signed an agreement with the Washington Monitored Treatment Program (WMTP) to enter in–patient treatment for chemical dependency. Other aspects of the treatment program included abstinence from narcotics, attendance at weekly WMTP group therapy sessions, twice–weekly alcoholics/narcotics anonymous meetings, and random urine samples. Dr. Olmstead further entered into a stipulation and assurance of discontinuance with the Medical Disciplinary Board, which resolved allegations of unprofessional conduct under RCW 18.130.180, based upon his drug usage. By this stipulation, Dr. Olmstead agreed not to use controlled substances, to comply with the requirements of WMTP and

---

[1] At the 1989 Board hearing, he denied portions of the statement, disputing the duration and frequency of his morphine use.

maintain satisfactory status in the program. The stipulation stated that violation of the assurance of discontinuance was grounds for disciplinary action under RCW 18.130.160. In a separate agreement with a Seattle hospital, Dr. Olmstead agreed that he would not under any circumstances personally handle controlled substances at the hospital.

At the Board hearing, various witnesses testified that Dr. Olmstead had problems in his treatment program. Dr. Richard Irons, director of WMTP, testified that Dr. Olmstead's chart contained references to missed group therapy meetings in January and February 1988, prior to Dr. Irons' joining WMTP. Nevertheless, Dr. Irons thought Dr. Olmstead was "doing fine" in the program until the spring of 1989, when Dr. Irons "got to the point where I no longer knew whether Dr. Olmstead was continuing to pursue his recovery responsibly." On two occasions in April and May 1989, Dr. Olmstead called less than 30 minutes before his group therapy meeting to say he would be absent. In April, he said there was an emergency at the hospital and in May he said he had just brought his wife home from the hospital. He was absent from another meeting in May, again due to serious health problems involving his wife, and he testified he left a message with a WMTP secretary explaining that he was going to miss the meeting. Dr. Irons testified that in times of stress, a person in recovery is at risk and particularly needs to attend group meetings and not subordinate recovery to other demands.

In the meantime, the WMTP received information that Dr. Olmstead's staff privileges at the Seattle hospital had been revoked due to reports that he had switched morphine tubexes on two occasions, the second time arguably verified by testing the substituted tubex. It was also reported that Dr. Olmstead had attempted to provide a false urine sample. Dr. Irons met with Dr. Olmstead in late July, following which he reported to the Medical Disciplinary Board that he had reasonable doubt about Dr. Olmstead's ability to practice with skill and safety.

The Medical Disciplinary Board summarily suspended Dr. Olmstead's license to practice pending a further hearing, which was held in October. Dr. Olmstead was charged by the Board with using controlled substances in June and July, being out of compliance with the WMTP, and unprofessional conduct. After a hearing, the Board found:

1.4 Respondent is addicted to narcotics and suffers from the disease of chemical dependence.

. . . .

1.11 Respondent did not attend group therapy on April 26, 1989, May 17, 1989, and May 24, 1989.

1.12 Respondent did not call 24 hours in advance to let the Washington Monitored Treatment Program know he would not attend the group therapy sessions of April 26, 1989, May 17, 1989, and May 24, 1989.

. . . .

1.14 Respondent, Stephen Olmstead, failed to comply with the requirements of the Stipulation and Assurance of Discontinuance of February 1988, in that he failed to comply with the requirements of the Washington Monitored Treatment Program and did not maintain satisfactory status in that program . . ..

. . . .

1.17 While the evidence was not sufficient to substantiate the charges contained in paragraph III of the statement of charges ["that in the months of June and July, 1989 respondent used controlled substances or legend drugs"], the panel has grave concerns about respondent and respondent's recovery.

The Board suspended Dr. Olmstead's license to practice medicine for 10 years, but stayed the suspension on condition that he participate in the Lawyer Assistance Program (in lieu of the WMTP), attend meetings of Narcotics or Alcoholics Anonymous twice each week, continue to see his psychiatrist, appear before the Board every 6 months for compliance reviews and to report on his recovery, and obey all laws and rules governing the practice of medicine. Dr. Olmstead petitioned the Superior Court for review of the Board's decision and the Superior Court certified it for direct review by this court.

We review a decision of the Medical Disciplinary Board pursuant to the administrative procedure act, which

provides that this court may grant relief from an agency's order when the order violates the constitution, is beyond statutory authority, is unsupported by substantial evidence, is arbitrary and capricious, or when the agency employs improper procedure. RCW 34.05.570(3).

## I

Dr. Olmstead first argues that the summary suspension of his license violated statutory requirements and deprived him of a valuable property right without due process of law. There was no request for review at the time of the summary suspension, which, in fact, was dissolved by the Board's order following the 1989 formal Board hearing. Because this appeal is taken from that order of the Board, rather than from the summary suspension, any issue based on the summary action is now moot. We therefore decline to consider this argument. *See Crane v. Stanwood Sch. Dist.*, 41 Wn. App. 707, 705 P.2d 1236 (1985).

## II

Dr. Olmstead next contends that the statement of charges violated his due process rights. He argues that he was not given adequate notice that his failure to attend group meetings was part of the factual basis for the charges against him.

Due process requires notice of the issues to be raised at a disciplinary hearing, *In re Ruffalo,* 390 U.S. 544, 20 L. Ed. 2d 117, 88 S. Ct. 1222 (1968). However, Dr. Olmstead was aware that the WMTP included required attendance at weekly group therapy meetings. He was told at a May 1989, meeting with WMTP staff that absences from group therapy were a concern. Thus, the charge "[t]hat Respondent has failed to comply with the requirements of the Washington Monitored Treatment Program and maintain satisfactory status in that program" provided sufficient notice for his preparation for the hearing.

## III

Dr. Olmstead next contends that the Medical Disciplinary Board violated due process requirements and the

appearance of fairness doctrine by combining investigative, prosecutorial and adjudicative functions. We disagree.

The Washington Supreme Court has held that the combination of these functions in one administrative agency does not necessarily violate due process protections. *State Med. Disciplinary Bd. v. Johnston,* 99 Wn.2d 466, 476–78, 663 P.2d 457 (1983). *See Withrow v. Larkin,* 421 U.S. 35, 43 L. Ed. 2d 712, 95 S. Ct. 1456 (1975).

The court in *Johnston* addressed the issue of appearance of fairness and could "detect no inherent unfairness in the mere combination of investigative and adjudicative functions, without more, that would prompt invocation of the appearance of fairness doctrine." *Johnston,* 99 Wn.2d at 479. Nor do we believe that the prior consideration of the summary suspension necessarily operates as a blanket disqualification of all the Board members from further proceedings in the matter.

The court in *Johnston* did note that it is preferable for the Attorney General's office to provide two separate attorneys to perform the two functions of legal advisor to the board and prosecutor. *Johnston,* 99 Wn.2d at 480–81. That procedure was followed in this case. Thus, under the circumstances of this case, we reject the appearance of fairness and due process contentions.

## IV

We turn now to the most troubling aspect of this case. Dr. Olmstead challenges the Board's finding relating to his failure to provide at least 24 hours' notice in connection with the missed therapy meetings in April and May 1989, the further finding that he was not in compliance with the requirements of the WMTP, and the resultant 10–year license suspension order.

■ Findings of fact under the APA must be supported by substantial evidence. RCW 34.05.570(3)(e). Substantial evidence has been defined as "evidence in sufficient quantum to persuade a fair–minded person of the truth of the declared premises." *Green Thumb, Inc. v. Tiegs,* 45 Wn. App. 672, 676, 726 P.2d 1024 (1986).

■ We have carefully reviewed the record of the formal hearing before the Board. Neither the agreement between Dr. Olmstead and the WMTP nor the stipulation with the Board contained any reference to a "requirement" of 24 hours' notice for missing a group therapy meeting. Dr. Irons did testify that group therapy was an important aspect of treatment because it aids in overcoming the denial pattern typically involved in drug addiction. However, he testified that "there is, in our program, a *request* that the person be involved in weekly group therapy, which is run by a trained facilitator." (Italics ours.)

Dr. Irons did state that the quality of one's participation in the program was measured by the degree an individual takes responsibility for his or her recovery. Numerous examples were recited, including "[t]he ability of a person to inform us, if they're not going to be in group therapy because they're sick, 24 hours in advance, rather than at the last minute before a group starts." This is the *only* reference to a 24–hour notice "requirement" in the entire record.

Dr. Irons went on to testify, however, that

We are talking in a generic sense here and not in any way about this situation, I assume.

. . . .

To be very honest with you, not everyone—we're not perfect and no one in the program—I'm sorry, there is one person in the program that has obsessively complied with every single thing that needed to be done. But, other than that one person I can think of, I don't know of anyone else who has, and, therefore, we're talking about substantial compliance here.

In other words, as Dr. Irons carefully pointed out in his further testimony, the WMTP attempted to deal with its participants fairly and practically. It did not report every minor deviation to the Disciplinary Board because it attempted to distinguish between an occasional lack of cooperation and genuine noncompliance. In fact, the report on Dr. Olmstead was not generated by lack of adequate notice for missing these therapy sessions, but rather the concerns over relapse based upon the urine test report and

the hospital's reported basis for its revocation of staff privileges.

We note there was considerable evidence before the Board, albeit denied by Dr. Olmstead, that might have supported a finding of new instances of drug abuse. However, the Board specifically found that charge to be unsubstantiated. It then proceeded on a hypertechnical basis to find a lack of compliance with WMTP *requirements,* which, on the basis of the record, do not appear to have been articulated as requirements at all. The Board then issued a severe order which would have been entirely appropriate if it had determined that Dr. Olmstead had lapsed into renewed illegal usage of morphine. Such order, on these findings, was arbitrary and capricious. If the Board believed the evidence of renewed drug use, the Board had the responsibility to so find. When it rejected that evidence, it was not at liberty to find that the evidence nevertheless raised "concerns" and proceed to enter the order it did. We therefore reverse.

## V

Finally, Dr. Olmstead argues that the Board failed to fulfill its statutory obligation to publicly exonerate him from the allegation of illegal drug usage. RCW 18.130-.110(1). Given the decision of this court reversing the Board's order and upon issuance of the mandate from this court, the Superior Court shall direct the Board to comply with the requirements of RCW 18.130.110 to publish the information that Dr. Olmstead's license to practice medicine is not suspended.

The decision of the Washington Medical Disciplinary Board is reversed.

COLEMAN and FORREST, JJ., concur.

After modification, further reconsideration denied August 29, 1991.