13 P.3d 663 (2000)
103 Wash.App. 573
DEPARTMENT OF TRANSPORTATION, WASHINGTON STATE FERRIES DIVISION, Respondent,
v.
INLANDBOATMEN'S UNION OF THE PACIFIC, Appellant.
No. 24742-9-II.
Court of Appeals of Washington, Division 2.
December 1, 2000.
*664 David J. Slown, Asst. Atty. Gen., Seattle, for Respondent.
*665 Dmitri L. Iglitzin, Lawrence Rea Schwerin, Schwerin Campbell Barnard Lip., Seattle, for Appellant.
ARMSTRONG, C.J.
When the Tacoma, part of a new class of ferry vessels, came into service, the United States Coast Guard required an emergency evacuation person to be on board whenever the vessel carried passengers. The Washington State Ferries (WSF) assigned the emergency evacuation person's duties to a member of the galley crew. The Inlandboatmen's Union of the Pacific (IBU), whose members staff all other required crew positions on the ferries, objected to the WSF's action and filed an unfair labor practice charge. The IBU claimed that the WSF had unilaterally altered the scope of the IBU's bargaining unit by assigning work formerly performed by IBU's members to employees outside the bargaining unit, and that the WSF had refused to bargain with the IBU about the position. The Marine Employees' Commission (MEC) concluded that the WSF had committed an unfair labor practice and ordered that the work be assigned to an IBU member. The WSF appealed to the superior court, which reversed the MEC's decision, ruling that the MEC found facts not supported by substantial evidence and applied the wrong legal test. The IBU appeals. We affirm the MEC, holding that its decision is supported by substantial evidence and that it did not err in concluding that the WSF altered the IBU bargaining unit by assigning the work to galley workers.

FACTS
Each automobile ferry in the WSF fleet has a deck department, an engine department, and a steward's department. The deck department is staffed by IBU deckhands; the Marriott Corporation employs the galley workers in the steward's department.[1]
For every WSF vessel, the Coast Guard issues a Certificate of Inspection (COI) that lists the mandatory and permissive personnel for the vessel. The COI for the Tacoma required one emergency evacuation person. The COI's for other classes of WSF vessels do not require an emergency evacuation person.
The duties of the required people listed in the COI are described in the station bills, which are approved by the Coast Guard. The Tacoma station bill requires the emergency evacuation person to "Maintain Order in Cabin" and to "Assist as Directed;" in fire actions that person is to "Maintain Order Cabin Zone 2 & 4" and "Assist as Directed;" and in abandon ship actions that person is to be "In Charge of Cabin Zone 4" and "Assist at Embarkation Station 4." A WSF witness testified before the MEC that emergency drills take place about once a week on each vessel and generally last five to fifteen minutes. Dennis Conklin, the business agent for the IBU, testified that he participated on a crew that drilled twice a week for two hours a day.
In the summer of 1997, WSF began planning to use Marriott employees as the emergency evacuation person. Before assigning these duties to a Marriott worker, the WSF trained all of the Marriott employees in emergency procedures. Conklin testified that Marriott told him that the training was done because the galley workers requested it after the Coast Guard asked them questions about what to do during a fire and they could not answer. Other evidence suggested that the WSF was training the Marriott employees to fill the new emergency evacuation position. An email from the WSF, regarding Marriott training, states "the Marriott people working TACOMA MUST(!) be trained prior to TACOMA being put into customer service." And a memorandum from Joe Nortz, the director of marine operations at the WSF, to Marriott states that the objective of the training program was to "[e]nsure the *666 appropriate training is provided to Marriott personnel to meet the above goal, and to meet U.S. Coast Guard expectations as competent `persons other than the crew' listed on vessel Muster Lists and Station Bills." Nortz testified that if the Marriott employees were not trained before Tacoma began carrying passengers, the WSF would have had to hire another Ordinary Seaman to fill the emergency evacuation position.
On September 11, 1997, the WSF met with the IBU. The purpose of the meeting, according to the WSF, was to inform the IBU of the WSF's intent to staff the emergency evacuation person with a Marriott employee. The IBU, however, declined to hear the WSF's presentation and stated that the position should be filled by an IBU member.
Three weeks later, the IBU filed an unfair labor practice complaint, which was adjudicated by the MEC. In the unfair labor practice charge, the IBU claimed that the WSF had violated RCW 47.64.130 and WAC 316-45-003 by "[i]nterfering with, restraining or coercing employees in exercise of rights."
The MEC ruled in favor of the IBU, finding, in part, that:
2. With respect to its ferry, TACOMA, without timely notice to complainant, respondent instituted and developed plans, including those for requisite training, to use employees of its subcontractor, Marriott in an effort to fulfill the U.S. Coast Guard's formal specifications as to the complement of personnel required absolutely for performance of functions aboard the vessel in drills and emergencies.
3. In so proceeding, WSF attempted to change substantially the boundaries and borders of the bargaining unit composed of its employees represented by IBU, as such unit was established, relative to personnel and scope, by the parties' invariable practice over the years in keeping with and complimentary to the governing [COI] issued by the U.S. Coast Guard. In the instant matter, the authoritative COI regarding the TACOMA does not prescribe that it may or shall be staffed by employees of the subcontractor Marriott, instead of WSF's deck department personnel represented by complainant.
4. When the TACOMA was placed in active service, WSF effected its unilateral intent to change the perimeters of the bargaining unit represented by the complainant without bargaining with complainant and without complainant's consent or waiver of its pertinent rights under the law, or any of them.
The MEC concluded, in part, that:
2. By fait accompli, respondent WSF attempted to alter and modify the borders of the bargaining unit of its employees represented historically by IBU under RCW 47.64 in accord with the governing Coast Guard COI, without the IBU's consent or waiver, and thereby departed from its lawful duty to bargain in good faith as required by such statutes.
3. By way of remedy for such violation, WSF should be required forthwith to cease and desist in the assignment of employees of the subcontractor, Marriott, to performance of bargaining unit work on the TACOMA, i.e., work of the position described by the official COI as "emergency evacuation person" and should forthwith and henceforth assign such work to an employee of WSF represented by the IBU.
The superior court reversed the MEC, concluding that substantial evidence did not support findings of fact numbers three and four and that the MEC erred in its conclusions of law numbers two and three.

ANALYSIS

I. Standard of Review
The IBU argues that the MEC is vested with "complete authority to resolve labor disputes between the ferry system and ferry employees." The trial court, continues the IBU, erroneously substituted its judgment for that of the MEC without giving proper deference to the agency's expertise.
Washington's policy is to "promote harmonious and cooperative relationships between the ferry system and its employees by permitting ferry employees to organize and bargain collectively" and to "promote just and fair compensation, benefits, and working conditions for ferry system employees...." *667 RCW 47.64.006(3), (7). The legislature created the three member MEC to achieve these ends. RCW 47.64.280(1). Among other duties, the MEC shall "[a]djust all complaints, grievances, and disputes between labor and management arising out of the operation of the ferry system." RCW 47.64.280(2)(a).
The Administrative Procedure Act, RCW 34.05, applies to decisions of the MEC as a state agency[2] authorized to adjudicate disputes. RCW 34.05.010(2), .030. In an appeal from an MEC decision, we review the record before the MEC, not the record from the superior court. See Tapper v. Employment Sec. Dep't, 122 Wash.2d 397, 402, 858 P.2d 494 (1993). RCW 34.05.570(3) sets forth our standard of review. We review findings of fact under a substantial evidence test; we review questions of law de novo under an error of law standard. RCW 34.05.570(3)(e), (d); Wilson v. Employment Sec. Dep't, 87 Wash.App. 197, 201, 940 P.2d 269 (1997).
The first question is whether substantial evidence supports the MEC's findings of fact. Substantial evidence is evidence sufficient to persuade a reasonable person that the declared premise is true. Heinmiller v. Dep't of Health, 127 Wash.2d 595, 607, 903 P.2d 433 (1995), amended by 909 P.2d 1294 (1996); Nghiem v. State, 73 Wash.App. 405, 412, 869 P.2d 1086 (1994); Olmstead v. Dep't of Health, 61 Wash.App. 888, 893, 812 P.2d 527 (1991). The WSF challenges findings 3 and 4.

II. Substantial Evidence Supports the MEC's Findings of Fact
A. Finding of Fact 3Changing the Boundaries and Borders of the Bargaining Unit.
The IBU contends that the central issue is whether the emergency evacuation person's work is within the historic scope of IBU deckhand representation. According to the IBU, the COI defines the scope of the IBU unit at the WSF and, thus, the duties of the new position are within the borders and boundaries of the IBU. The IBU further asserts that filling a COI required position with a galley worker was a break with 40 or 50 years of practice. Overall, the IBU contends that the emergency evacuation person's duties are similar to those of the deck department's and outside galley employees' historical duties. The WSF, however, argues that the emergency evacuation person is "not a separate, discrete or new position." Rather, the emergency evacuation person's duties are in keeping with the type of work typically performed by the steward's department.
Here, the evidence before the MEC supports its finding that the emergency evacuation person's duties are the same duties historically performed by IBU members not galley workers. Conklin testified that, traditionally, galley employees only took "care of any emergency that occurred within the galley." He also testified that Able Bodied Seamen and Ordinary Seamen take care of emergencies outside of the galley.[3] Thus, according to Conklin, assigning the new work to Marriott employees expanded the galley workers' role in emergency preparedness "galley people are [now] required to participate in lifeboat drills, rescue, the fire fighting, the manning of the hoses." Perhaps most significantly, Nortz testified that if the training of Marriott employees had not been completed before Tacoma began carrying passengers, the WSF would have had to hire another Ordinary Seaman in order to fulfill the COI requirements.
The Marriott training program itself supports finding 3. The training program consists of baseline training and vessel specific training. Baseline training covers muster lists and emergency assignments, emergency communications procedures, crowd control techniques, emergency evacuation plans, fire *668 chemistry and makeup, and fire fighting with portable fire extinguishers. Vessel specific training includes communication system locations and operations, portable and fixed fire extinguishing system locations and operations, electrical power supply locations and shutoff procedures, and ventilation system theory, components and shutoff locations and operations.
A letter from the Coast Guard to the WSF described the duties required of Marriott personnel as including: "[a] Communications during vessel emergencies[;][b] Initial galley fire fighting methods, to exclude hose team participation[;][c] Crowd control procedures, life preserver donning assistance during abandon ship or vessel fire emergencies."
Yet, Nortz testified that galley employees were being used on fire hose teams and lifeboat parties, well beyond what he expected of galley personnel. Conklin testified that Marriott told him these employees were not supposed to be doing these drills. That this additional training goes beyond the scope of the typical responsibilities of the steward's department is also shown by a WSF letter to the Coast Guard, listing the areas that are not appropriate for Marriott worker training: "assisting in, or knowledge of, how to launch rescue boats and/or survival craft[;] fire fighting equipment and fire hose handling[;] damage control equipment and methods[;] survival craft leadership roles." Even Lisa Failing, the human resource manager for Marriott management services at the WSF, testified that the WSF does not expect galley employees to operate lifeboats or man fire hoses.
But the WSF argues that the only evidence of a change in the steward's department personnel is opinion testimony from Conklin. The WSF did not, however, object to Conklin's testimony and the MEC is not bound to strictly apply the rules of evidence. RCW 34.05.452, .461; 47.64.280(3). It is the duty of the MEC, not a reviewing court, to weigh the evidence presented to it. See Aviation West Corp. v. Dep't of Labor and Indus., 138 Wash.2d 413, 429, 980 P.2d 701 (1999). And the MEC heard other evidence supporting Conklin's testimony.
An IBU Ordinary Seaman is "[r]equired to stand by to assist Able Seamen with fire, rescue and abandon ship drills." This includes "handling fire hose for testing and preparing life boat for release to water." David Frieboth, National President of IBU of the Pacific, testified that emergency life saving techniques are primarily the responsibility of the deck and engine departments both staffed by IBU personnel. Furthermore, because the position is mandatory it must be filled even when the galley is not open. And the duties of the emergency evacuation person, as evidenced by the station bill, are not limited to the galley; they extend to the cabin and various cabin zones. Thus, there is sufficient evidence to support the MEC's third finding of fact.
B. Finding of Fact 4Mandatory Bargaining
The IBU argues that because the emergency evacuation person's duties are within the union's work jurisdiction, assigning the duties was a subject of mandatory bargaining. Citing Public School Employees of North Franklin v. North Franklin School District, No. 8854-U-90-1941, 1992 WL 753248 (Wash.Pub.Emp.Rel.Com.), aff'd, Decision 3980-A (PECB, 1993), the IBU argues that "[t]he duty to bargain arises from the infringement on the union's work jurisdiction." Relying on International Ass'n of Fire Fighters, Local Union 1052 v. Public Employment Relations Commission, 113 Wash.2d 197, 778 P.2d 32 (1989), the WSF counters that assigning the work to a Marriott employee was a staffing decision, one of the "fundamental prerogatives of management." And, continues the WSF, although staffing decisions may be subject to mandatory bargaining, the MEC should have used the balancing test set out in Fire Fighters, Local 1052, 113 Wash.2d 197, 778 P.2d 32. This test weighs the effect of the employer's decision on wages, hours, and working conditions against the "extent to which the subject lies `at the core of entrepreneurial control.'" Fire Fighters, Local 1052, 113 Wash.2d at 203, 778 P.2d 32 (quoting Fibreboard Paper Prods. Corp. v. NLRB, 379 U.S. 203, 222-23, 85 S.Ct. 398, 13 L.Ed.2d 233 (1964)). It is only subject to mandatory arbitration if the *669 employer's decision weighs more heavily on wages, hours, and working conditions. The WSF concludes that under the Fire Fighters, Local 1052 balancing test, the emergency evacuation assignment to Marriott was not subject to mandatory bargaining because it had no impact on IBU members or Marriott employees.
In North Franklin, the employer terminated a food services clerk and assigned some of the former clerk's work to an outside consultant. The Public Employment Relations Commission (PERC), following precedent under the National Labor Relations Act, reiterated that "an employer's decision to transfer work historically performed by bargaining unit employees to persons outside of the bargaining unit is a mandatory subject of collective bargaining." North Franklin School District, 1992 WL 753248 at *5. Under North Franklin the question is whether assigning the duties of the new emergency evacuation position to Marriott transferred work from the IBU.
Because the MEC analyzed the issue as one of subcontracting, it did not apply a Fire Fighters, Local 1052 analysis. The superior court did apply such an analysis, opining that "the impact upon workload and safety is so slight because of the very limited impact of emergency training and work that the balance must tip decisively in favor of management prerogative." Even if the MEC had analyzed the dispute under Fire Fighters, Local 1052, it may not have reached the same result as the superior court. The IBU lost potential wages and benefits. The MEC may have weighed that loss more heavily than the WSF's right to entrepreneurial control. Moreover, MEC Decision No. 22 does not support the WSF's position. In that decision, the WSF contracted out a duty free store on a ferry and the MEC held that this was a managerial decision. The gift shop employees were required to have a "Z" Coast Guard card and they were assigned to emergency stations. But the emergency duties assigned to the gift shop employees were not critical to the vessel's operation; here, the COI requires an emergency evacuation person on the Tacoma.
More importantly, the MEC did not view the dispute as a staffing issue. Staffing issues include managerial decisions, such as termination of a service contract, that are motivated by an economic business decision of the employer but that also affect the employment relationship. See First Nat'l Maint. Corp. v. NLRB, 452 U.S. 666, 677, 101 S.Ct. 2573, 69 L.Ed.2d 318 (1981); Fire Fighters, Local 1052, 113 Wash.2d at 200, 778 P.2d 32. But the need for an emergency evacuation person on the Tacoma did not arise as the result of an economic business decision by the WSF. Rather, the Coast Guard required the new position for safety reasons. Under these circumstances, the MEC saw the question as whether the employer had attempted to change the boundaries of the IBU bargaining unit contrary to "invariable practice over the years." In doing so, the MEC decided what principle of labor law to apply. We find no error in the MEC's interpretation or application of the law. And this is clearly a situation where we should defer to the MEC's expertise in labor law. See Macey v. Dep't of Employment Sec., 110 Wash.2d 308, 313, 752 P.2d 372 (1988).

III. Did the MEC Apply the Proper Test?
The WSF maintains that the MEC did not apply the proper test in determining whether it had altered the boundary of the bargaining unit. The appropriate test, according to the WSF is to compare the new job with the jobs in the bargaining unit, looking for a community of interest. And there is no community of interest, continues the WSF, because no new job was created and the "galley employees have always been required to participate in emergency drills." But the MEC heard evidence to the contrary. Conklin testified that IBU deckhands had always performed emergency duties outside the galley; that galley workers had performed emergency duties only in the galley; that the new position included emergency duties outside the galley, such as life boat drills. Thus, even measured against the community of interest standard, the evidence supports the MEC finding that the WSF attempted to alter the boundaries of the traditional IBU bargaining unit.

*670 IV. Did the WSF Bargain in Good Faith Regarding the Emergency Evacuation Person?
After the Coast Guard issued the temporary COI for the Tacoma, the WSF met with the IBU on September 11, 1997, to discuss staffing levels. The WSF intended to inform the IBU of its proposed staffing plan, including the use of a Marriott person to fill the emergency evacuation position. Gary Baldwin, acting director of human resources for the WSF and manager of labor and employee relations for the ferry system, testified that, from the WSF's perspective, "it's a black or white situation when it comes to staffing." Baldwin further testified that the WSF was not flexible in their position on staffing the Tacoma. The IBU declined to hear the WSF's presentation at this meeting, asserting that WSF should fill the position with an IBU member.
Although the time frame is unclear, there was evidence that the WSF intended to "consider [the IBU's] concerns about the situation" and get back to the IBU.[4] When the IBU did not hear back from the WSF, they filed the unfair labor charge.
Section 7.05 of the parties' Collective Bargaining Agreement states:
In the event vessels or facilities are added or if present units are re-engined the parties shall immediately meet to negotiate the appropriate wages, hours, terms and conditions of employment for any employee(s) assigned to the vessel or facility. In the event the parties fail to agree within (3) working days, or any mutually agreed upon extension either party may invoke the provision of RCW [47.64][5] for final resolution of the matter.
Here, the Tacoma was a new ferry classification within the WSF system. Thus, the parties were required to negotiate the wages, hours, terms, and conditions of employment for the various employees on the vessel. But, the WSF did not see its decision to assign the emergency evacuation position to Marriott employees as wages, hours, or terms of employment negotiable under section 7.05. And the WSF did not intend the meeting in September to be a bargaining session.
Nevertheless, the WSF argues that the MEC erred in concluding that it refused to bargain. The WSF contends that the obligation to bargain is mutual and that under section 7.05, the IBU should have demanded arbitration.
The MEC found that, without notice to the IBU, the WSF planned to and did assign traditional IBU work to a subcontractor. Thus, according to the MEC, the WSF presented the IBU with a fait accompli. The evidence before the MEC supports this finding. Moreover, the MEC ruled that the IBU was "not obliged to bargain with respect to a plan of WSF to alter the scope of the unit from the officially declared perimeters and the extensive, undisputed and sustained practice developed by the parties." Finally, the MEC reasoned that section 7.05 did not describe the bargaining unit and, thus, provided no basis for arguing that the IBU had waived its right to file the unfair labor charge. We agree.
Section 7.05 required the parties to bargain over wages, hours, terms, and conditions of employment for that employee. The WSF unilaterally and without notice to the IBU implemented the plan to staff the new emergency position with Marriott employees. In doing so, the WSF treated the issue as one not involving wages, hours, or terms of employment. It cannot now claim that the IBU waived its right to file an unfair labor charge by not pursuing arbitration under section 7.05.
We affirm the decision of the MEC.
BRIDGEWATER, J., and HUNT, J., concur.
NOTES
[1] Manny Perez, the safety director for the WSF and previously a lieutenant in the Coast Guard, testified that the emergency evacuation person must have a merchant mariner's document, which would be endorsed as "Ordinary Seaman, Wiper, Steward's Department, Food Handler." Galley workers are also members of the IBU, but they are part of a different bargaining unit. Further, Ordinary Seamen employed by the WSF do not perform any galley duties and galley employees do not perform any Ordinary Seamen duties.
[2] Under RCW 34.05.010(2),

`[a]gency' means any state board, commission, department, institution of higher education, or officer, authorized by law to make rules or to conduct adjudicative proceedings, except those in the legislative or judicial branches, the governor, or the attorney general except to the extent otherwise required by law and any local governmental entity that may request the appointment of an administrative law judge under chapter 42.41 RCW.
[3] Able Bodied Seamen and Ordinary Seamen are members of the IBU.
[4] Freiboth and Conklin testified that the WSF indicated that they would get back to the IBU within one week. Baldwin testified that the WSF would get back to the IBU as "quickly as possible."
[5] Although the Collective Bargaining Agreement refers to RCW 46.64, the correct cite is RCW 47.64.