IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 31487-1-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| ADAM EDWIN POWELL, | ) | |
| | ) | |
| Appellant. | ) | |

FEARING, J. — Adam Powell assigns constitutional infirmity to his trial on

the theory that the trial court violated his public trial rights when engaging in

unrecorded sidebar conferences during jury selection. He also contends

insufficient evidence supports his conviction for second degree murder and an

aggravated domestic violence exceptional sentence. We disagree with all

assignments of error and confirm Powell's conviction and sentence.

FACTS

This prosecution of Adam Powell for murder arises from the death of Sabrina

Flores from a gunshot wound on October 23, 2010, while inside Powell's Tieton home.

The two were romantically involved. Since Powell challenges, in part, the sufficiency of

the evidence, we draw facts from lengthy trial testimony.

During trial, Adam Powell testified on his own behalf. According to Powell, he and Sabrina Flores met in March 2010 and started a dating relationship within a month. In July 2010, Flores began residing with Powell in one side of a duplex at 905 Tieton Avenue, Tieton. Powell described the relationship with Flores as volatile.

During trial, the State presented testimony of alleged abuse of Adam Powell, preceding Sabrina Flores' death, inflicted on Flores in order for the State to prove an aggravated domestic violence sentencing factor. Brenda McCoy testified that, on September 12, 2010, she observed a young lady sobbing as she walked on the street in front of McCoy's residence. A car then struck the woman from the rear. The young woman flew five feet off the street. McCoy ran from her house and helped the victim from the pavement. McCoy implored the woman to enter McCoy's house. The victim declined, and the offending car returned minutes later. The driver ordered the victim into the car. McCoy called law enforcement. During trial, McCoy identified Powell as the driver of the car, but only because he sat in the courtroom and she knew he was the defendant.

On September 12, 2010, Yakima Police Officer Juan Ceja responded to 905 Tieton Avenue, Adam Powell's residence, to investigate a report of domestic violence. Officer Ceja heard a female screaming inside the residence, and he immediately entered the home. Officer Ceja saw a female sitting on the couch with ripped pants and fresh scrapes

2

on her knees. Ceja escorted Powell from the residence, and Powell informed the officer

that he and the woman were driving in Naches when she jumped from the car. The

woman got in front of the car and he "tapped her" with the vehicle. Report of

Proceedings (RP) at 851-52.

Griselda Vaca and Ernesto Amonzo, wife and husband, resided in the other side of

the duplex in which Adam Powell and Sabrina Flores lived. At trial, Vaca testified that

she sometimes heard "mumbling" coming from the other side of the duplex walls and a

loud male using the "F" word. RP at 920-21. She also often heard the male talking and

the female sobbing in the living room. Vaca was not home at the time of the October 23

shooting. Ernesto Amonzo, at trial, averred that he heard yelling and crying on an

average three times weekly in Powell's side of the duplex.

Adam Powell testified that, earlier on October 23, 2010, he went shooting with his

.40 caliber hi-point handgun. When he arrived home, Sabrina Flores told him she was

preparing for a shower and would later return a computer to her father. Powell answered

a cell phone ring. Flores' father was the caller, and Powell handed the phone to Flores.

After ending the call, Flores showered, and Powell walked to the post office two blocks

away. According to Powell, when he returned home, Flores accused him of spying on

her. He sat on the couch, removed his firearm from his pants, and placed the gun on the

coffee table. Powell intended to walk upstairs to change his pants, but became distracted

by a pile of Flores' belongings in the kitchen. He noticed his pants on top of the pile,

3

and, as he retrieved them, he found a methamphetamine pipe. An argument ensued, and both Powell and Flores screamed at each other. Powell exclaimed: "since your stuff is packed, you can go live with your father because I'm done with this." RP at 1425.

According to Adam Powell's trial testimony, he threw the pipe away and proceeded up the stairs to change his pants. When Powell returned downstairs, he saw Sabrina Flores, in the living room, with his handgun to her forehead. He yelled at her to stop. When she told him to leave, Powell lunged at her in an attempt to remove the gun. Flores and Powell fought over the firearm, fell to the floor, and Flores shot herself. Powell did not explain whether Flores shot herself accidently or on purpose. Powell rolled Flores over and checked her breathing. She did not breathe and lacked a pulse. Powell moved the firearm from her, but he did not try to put the gun in her hand.

Duplex neighbor Ernesto Amonzo was home at the time of the shooting. Amonzo testified that he heard Powell yelling and a female crying for one half hour before hearing a gunshot. He overheard Powell shout: "[S]hut the fuck up. Fuck you, fuckin' bitch, stupid." RP at 895. After hearing a gunshot, Amonzo listened and heard Powell talking and pacing from one side to the other in his duplex.

After the shooting, Adam Powell first called a friend and then his grandmother. He later called 911 and reported that Sabrina Flores committed suicide. During trial, Powell admitted that he lied when reporting the shooting as a suicide because he feared law enforcement would blame him for murder, when he did not shoot Flores.

4

Apparently, he considered the story he told at trial consistent with an accidental shooting, rather than suicide. Powell testified that he never intended the gun to discharge and never wished the death of Flores.

Officer Juan Ceja of the Tieton Police Department responded to Adam Powell's emergency call of a suicide at Powell's residence. As Officer Ceja entered the dwelling, he saw Adam Powell kneeling on the ground while speaking on the phone with a 911 operator. Sabrina Flores lay on her back on the living room floor with left hand over her face and left foot crossed over the right foot. Blood puddled to the right side of her head. After ending the call, Powell sobbed hysterically and sweated. Powell told Officer Ceja that Flores shot herself.

Officer Juan Ceja escorted Adam Powell from the residence and into the backseat of his patrol car because the .40 caliber hi-point firearm rested next to Sabrina Flores' body. Officer Ceja returned to the residence to process the scene. He photographed the scene and secured the firearm. The officer did not reposition Flores' body and did not see anyone else move her.

Officer Juan Ceja found the positioning of Sabrina Flores' body on the floor suspicious. Officer Ceja concluded that someone had likely rolled over the body after the death. The blood stains on the firearm also raised Ceja's suspicions.

Detective Brian Jackson of the Yakima County Sheriff's Office traveled to Adam Powell's Tieton residence to investigate the death of Sabrina Flores. Detective Jackson

5

spotted a bullet hole on the right side of Sabrina Flores' head. Jackson also observed that blood drained from a wound on the left side of Flores' face and across her nose. Gravity would not have permitted the blood to move across the nose if Flores had always lay on her back. Jackson also concluded that someone had rolled Flores' body because feet cross if the body is limp and moved in that manner. Jackson also noticed blood on Flores' left palm, but not on her right hand.

Sergeant Jeff Gillespie arrived at the Tieton home and approached Adam Powell as the latter sat unrestrained in the patrol vehicle. Sergeant Gillespie read Powell his *Miranda* rights and briefly interviewed Powell. Powell told Gillespie that Sabrina Flores held the handgun to the side of her head, and, as he ambled toward her, she fired the gun and fell to the floor. After viewing the crime scene, Sergeant Gillespie spoke again with Powell and asked him with which hand Flores shot herself. After a long pause, Powell replied that the gun was in Flores' left hand and in direct contact with the side of her head.

Detectives from the Yakima County Sheriff's Office interviewed Adam Powell at 10:30 p.m. on October 23, 2010. At the conclusion of the interview, law enforcement arrested Powell on an unrelated felony warrant and transported him to the Yakima County jail. Authorities later announced to Powell that he was also under arrest for the murder of Sabrina Flores.

Dr. Gina Fino, a forensic pathologist, conducted an autopsy on Sabrina Flores. Dr.

6

Fino found evidence of a gunshot wound to the head and a gunshot wound to the right arm. The body contained an entrance wound to the left side of the head and an entrance wound to the right anterior upper arm. The entrance wound on the head was located behind the left ear with an exit wound on the right side of the face near the right eyebrow. Dr. Fino testified at trial that she found soot on soft tissue, evidence that someone held the gun muzzle close to the entrance wound. Fino noticed no skin splitting or stippling near the wound, such that she opined that fabric came between the muzzle and scalp. Dr. Fino also found an oval defect in the jacket worn by Flores.

Based on the blood pattern, Dr. Gina Fino concluded that Sabrina Flores did not stand and fall on her back when shot. Dr. Fino opined that, based on the evidence, Flores could not have held the gun in her left hand. Fino found the gunshot wound to be inconsistent with a self-inflicted shot.

On cross-examination during trial, Dr. Gina Fino conceded that Sabrina Flores may have fallen and hit the floor shortly before or as the gun fired. Fino could not "absolutely positively exclude" a scenario under which the gun fired when between Flores and someone on top of her. RP at 1302. On redirect examination, Dr. Fino testified that the hypothetical presented to her by Adam Powell's counsel was "not likely." RP at 1301. She opined that, given this hypothetical, the trajectory of the bullet would go from front to back. She further explained:

7

> [b]ut with this trajectory the muzzle of the weapon has to be behind the ear. Because it's a contact wound and it's behind the ear. And then the weapon has to be positioned as such that the trajectory can come from back to front.

RP at 1301. According to Fino, the hypothetical that Powell and Flores fell down together, causing the gun to discharge, defied gravity because of the bullet trajectory.

Anthony Jennings met Adam Powell, in October 2010, while both resided in jail. According to Jennings, Powell informed him he employed the name "Twisted." RP at 1144. Within twenty-four hours of meeting Powell in prison, Powell told Jennings that he killed Sabrina Flores, and Powell described the murder in detail. Powell disclosed that he and Flores fought the night of the murder. Flores angered Powell by wanting to leave and soliciting her father's assistance. Powell pushed her head down, placed the gun to her head, and "blew her head off." RP at 1147. Powell added that he used a .40 caliber chrome Smith and Wesson. Powell described in detail the crime scene to Jennings. During trial, Jennings depicted Powell's demeanor when Powell described the killing:

> [a]rrogant…[a] smile on your (sic) face saying, Ha, ha that's what the bitch gets Ha, I had her like this, and . . . [t]here was no remorse . . . [t]here wasn't no tears or nothing . . . [i]t was a smile on his face thinking he was cool.

RP at 1150.

During trial, Anthony Jennings further testified that Adam Powell told the story of the murder of Sabrina Flores over thirty times. In addition, Powell admitted mistakenly placing the gun in Flores' wrong hand, the opposite hand from where the bullet entered

8

her head.  Powell told Jennings he attempted to make the killing appear as a suicide.

Jennings also testified that Powell spoke of a time when he attempted to run Flores over

with a car and the neighbor came outside yelling.  Powell claimed to have choke

slammed Flores, punched her, and bounced her head off the walls on other occasions.

## PROCEDURE

The State of Washington charged Adam Powell with one count of murder in the

second degree with a firearm enhancement.  The State later amended the information to

charge Powell with one count of murder in the first degree with a domestic violence

aggravator.  Still later, the State filed another amended information that returned the

firearm enhancement to the information.  Before trial, the trial court ruled as admissible

certain ER 404(b) evidence as to domestic violence and Adam Powell's statements to

police.

Because Adam Powell's major contention involves events that occurred during

jury selection, we outline some of the voir dire.  During voir dire, the trial court

conducted six unrecorded sidebar conferences with counsel.  On the first day of trial,

January 30, 2013, the court conducted a sidebar at 12:21 p.m. and another at 12:22 p.m.

Immediately after the first unrecorded bench conference, the following colloquy

occurred:

> JUDGE: Is Sylvie Perrault here?
> JUROR: Yes.
> JUDGE: Sylvie Perrault?

JUROR: Yes.
JUDGE: Yes, I, I think someone related to you is going to testify in this case so I'm going to excuse you right now, okay? Thank you. Call in tonight and just give your questionnaire to the bailiff. Thank you.

RP at 525. Twelve lines later on page 525 of the report of proceedings, the trial court memorialized what occurred in the two sidebars:

JUDGE: Sure. I'll also put on the record that we had a brief side bar during the time that the jurors were filling out the instructions. We discussed one of our potential jurors who is related to one of the witnesses and was excused. Juror Perrault. And, see if I can find the number.
[STATE]: Number forty-eight, Your Honor.
JUDGE: Thank you. Number forty-eight. Yes, Sylvie Elsie Perrault has been excused. Also we discussed timing and agreed the jurors will come back tomorrow at nine and then we will meet before we bring them back in here to discuss the questionnaires or make any challenges for cause.

RP at 525-26.

On the afternoon of the second day of trial, January 31, 2013, juror 23 spoke during voir dire. Juror 23 reported that his daughter was raped and eventually committed suicide. He added that some events or conversations trigger "ambushes," and he might miss some testimony if sitting on a jury. The trial court then conducted the third unrecorded sidebar on January 31, 2013. Immediately after the sidebar, the court excused juror 23. The State's attorney later addressed the sidebar:

[STATE]: Your Honor, I just remembered one other thing. We had a side bar earlier?
JUDGE: Yes.
[STATE]: And I guess my understanding is, and it's a concern for me because of the, the *Bone-Club* analysis and cases from that, when we're

10

having these side bars, it's my understanding a lot of the judges in our superior courts aren't even doing those anymore—

JUDGE: Right.

[STATE]:—because of those cases and it causes concern about what's said there, even if it's being recorded over there versus just putting it on the record here, that people in, you know, these courtrooms are open to the public, that we shouldn't even be doing that at all anymore. That if we're gonna say something, we just do it outside the presence of the jury on the record instead of doing the side bar kind of how we did the last one.

JUDGE: And I have no problem at all with that once we get the jury we can send them out, but when we have this group of people I don't know how we do that. But I do appreciate what you're saying and I'm, and I don't disagree with it. Basically what we did during that side bar, and I'll put it on the record right now, and also another point to that is that the defendant is sitting over here and can't necessarily hear what we're saying although I trust that counsel would have reviewed it. I believe it had to do with letting one of our jurors go, which one was it?

[STATE]: [Juror 23], I think.

JUDGE: [Juror 23], oh yes, it was [Juror 23] who[se] daughter had been raped and then committed suicide and everyone agreed that he'd be a great juror but, on the other hand, it was a very emotional and traumatic experience for him and that there was high likelihood really that it would sidetrack him and distract him from the presentation of the evidence and everyone agreed to take him off. So, thank you for bringing that to my attention, I appreciate it.

[STATE]: Thank you, Your Honor.

RP at 703-04.

On the third day of trial, February 1, 2013, the trial court conducted, during voir dire, three additional unrecorded sidebars. Immediately after the first sidebar, Adam Powell's counsel forwarded a lengthy challenge, on the record, to a juror seated on the panel. Following the second sidebar, the State's attorney raised outside the presence of

11

the jury but in open court a *Batson* challenge. Following the third sidebar, the trial court stated, "[a]ll right, ladies and gentlemen. We have our panel." RP at 760.

Trial witness Anthony Jennings, who befriended Adam Powell in jail, testified that he was serving a fourteen-year prison sentence for robbery at the time of trial. Evidence of Anthony Jennings' prior crimes of dishonesty were admitted to impeach his credibility. Jennings acknowledged that he would be labeled a "jailhouse snitch," but he denied receiving a deal from the State for his testimony. Jennings declared that he testified because he did not value Powell's shooting of Sabrina Flores.

Jeffrey Kelso testified for the defense. Kelso declared that he knew Anthony Jennings and that Jennings knew Sabrina Flores and her family. During cross-examination, Kelso admitted that Jennings and the Flores family were merely acquaintances. The State impeached Kelso with evidence that he had been convicted of a crime of dishonesty.

The trial court gave a jury instruction for the lesser included offense of second degree murder. The jury returned a verdict of guilty of the lesser included offense of murder in the second degree. The jury also returned a special verdict that Adam Powell was armed with a firearm when he committed the crime and a special verdict that the crime constituted an aggravated domestic violence offense.

The trial court sentenced Adam Powell to an exceptional sentence upward of 340 months' confinement, including sixty months for the firearm enhancement. The trial

court also based the exceptional sentence on the domestic violence aggravator. During

the sentencing hearing, the trial court commented about aggravated domestic violence:

> He [Adam Powell] would say but they [Sabrina Flores and him]
> were s[oul] mates but admitted to calling her a fucking bitch. The
> neighbors heard that. If you want to know what this relationship was like
> because Sabrina can't tell us, we can hear about it from people that
> witnessed it. And like a lot of acts of domestic violence there often are not
> very many witnesses and that's done by design. People get are isolated,
> people are cut off from family from friends they're not allowed to leave. In
> this case it's pretty clear that she was packed up. All of her belongings her
> personal effects were out of the bedroom, they were piled in a bags and
> suitcases and plastic bags in the kitchen. She'd been apparently looking for
> a way to get her stuff out of the house. The yellow pages were turned to a
> page that showed U-Haul if I'm not mistaken. So she intended to leave.
> Mr. Powell testified that she was free to go anytime; that he never stopped
> her didn't ring true. Obviously she wanted to leave that's why her things
> packed up and she never was able to get out. The neighbors testified that
> and they lived in a duplex so there was close as neighbors can possible be,
> thin walls between the living room and they heard screaming and crying as
> often as three times a week. The gentlemen that lived in the house actually
> heard the incident that led up to this homicide. And heard screaming crying
> he turned up the TV and tried to get away from it.

RP at 1704. The sentencing court continued:

> So we know that there is an ongoing pattern of abuse here by what
> was heard by the neighbors. But we also have an incident that is very
> interesting and that's the incident with the car. Where Miss McCoy was so
> concerned that she called the police and then came in to testify.
> . . . .
> I think it says a lot about Sabrina's state of mind and her relationship
> with Mr. Powell because she was terrified and she was not she didn't think
> that anybody could help her. Apparently she didn't think that her parents
> could help her, she didn't think that Miss McCoy could help her, she was
> terrified of Mr. Powell. And there's lots of evidence to support that.

RP at 1705-06.

13

The trial court entered findings of fact and conclusions of law justifying an exceptional sentence. In its findings of fact, the trial court wrote:

> Under the domestic violence aggravator the jury found that Mr. Powell committed second degree murder when he and the victim were in a dating relationship and as part of an ongoing pattern of psychological or physical abuse of the victim manifested by multiple incidents over a prolonged period of time. Based on the jury's finding of the aggravated domestic violence offense, the court concludes, considering the purposes of the Sentencing Reform Act (SRA), that the facts found by the jury are substantial and compelling reasons justifying an exceptional sentence, a sentence above the standard range is in the interest of justice and is consistent with the purposes of the Sentencing Reform Act, and the exceptional sentence is appropriate to ensure that punishment is proportionate to the seriousness of the offense.

Clerk's Papers (CP) at 268.

After Adam Powell filed an appeal, the superior court conducted a hearing to determine the content of the unrecorded sidebar conferences during voir dire. Powell's trial defense counsel submitted a declaration that stated he lacked specific recollection of the sidebar discussion, but he inferred the subject of the discussion from the context of the record. The trial prosecutor filed a sworn statement, wherein he averred he also lacked recall of comments uttered during the sidebars. The trial court concluded that the sidebar conferences on February 1, 2013, entailed discussions of a challenge to a juror, the State's *Batson* challenge, and confirming members of the jury.

LAW AND ANALYSIS

Sufficiency of Evidence for Murder

On appeal, Adam Powell assigns error to the sufficiency of evidence to convict him of second degree murder and to impose an aggravated domestic violence increased sentence. He also contends the trial court violated his public trial rights when conducting unrecorded sidebar conferences during voir dire. We address the sufficiency of evidence for the conviction first, because acceptance of this assignment of error would moot the other challenges.

When reviewing a challenge to the sufficiency of the evidence, this court asks whether, viewing the evidence in a light most favorable to the State, any rational trier of fact could find the essential elements of the crime beyond a reasonable doubt. *State v. Green*, 94 Wn.2d 216, 220-21, 616 P.2d 628 (1980). We draw all reasonable inferences from the evidence in favor of the State and interpret the evidence most strongly against the defendant. *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). The elements of a crime can be established by both direct and circumstantial evidence. *State v. Kroll*, 87 Wn.2d 829, 842, 558 P.2d 173 (1976). This court must defer to the trier of fact on issues of conflicting testimony, witness credibility, and the persuasiveness of the evidence. *State v. Thomas*, 150 Wn.2d 821, 874-75, 83 P.3d 970 (2004).

Adam Powell contends that the State failed to prove, beyond a reasonable doubt, that the homicide was not excusable. The to-convict instruction for the lesser crime of

second degree murder read:

> To convict the defendant of the lesser crime of Second Degree Murder, each of the following elements of the crime must be proved beyond a reasonable doubt:
> (1) That on or about October 23, 2010, the defendant shot Sabrina Flores;
> (2) That the defendant acted with intent to cause the death of Sabrina Flores;
> (3) That Sabrina Flores died as a result of the defendant's acts; and
> (4) That the acts occurred in the State of Washington.

CP at 224. The trial court then instructed the jury on the defense of excusable homicide:

> It is a defense to a charge of Murder in the First Degree and to a charge of Murder in the Second Degree that the homicide was excusable as defined in this instruction.
> Homicide is excusable when committed by accident or misfortune in doing any lawful act by lawful means, or without any unlawful intent.
> The State has the burden of proving the absence of this defense beyond a reasonable doubt. If you find that the State has not proved the absence of this defense beyond a reasonable doubt, it will be your duty to return a verdict of not guilty.

CP at 225.

Adam Powell highlights that, although a jury decides credibility, the jury cannot resort to guess and speculation. *State v. Hutton*, 7 Wn. App. 726, 728, 502 P.2d 1037 (1972). Powell contends that, since Dr. Gina Fino could not conclusively rule out an accidental gunshot wound, the State did not establish beyond a reasonable doubt that the homicide was not excusable. Powell also labels Anthony Jennings' testimony as unreliable.

We conclude that the jury had sufficient evidence to reject the excusable homicide

16

defense and to convict Adam Powell of second degree murder.  When testifying at trial, Powell admitted to lying to law enforcement about a suicide.  His story evolved from suicide to an accidental shooting when he and Flores wrestled over the firearm and the gun fired, striking Flores in the head.  Anthony Jennings provided damning testimony about Powell admitting to intentionally killing Flores.  Jennings declared that Powell told him he put the gun in the wrong hand when he tried to stage a suicide.  Powell boasted thirty times of murder.  The jury could accept or reject Jennings' testimony at its discretion.

Forensic pathologist, Dr. Gina Fino, testified that Sabrina Flores likely did not die from a self-inflicted wound.  Dr. Fino added that the shooting scenario presented by Adam Powell defied science.  Adam Powell presented no countering expert testimony.  Powell cites no authority for the proposition that an expert must rule out all possibility of an accidental shooting in order to convict the accused of murder.

Public Trial Right

Adam Powell contends the trial court violated his right to a public trial when it entertained unrecorded sidebars without conducting a *Bone-Club* analysis.  *State v. Bone-Club*, 128 Wn.2d 254, 906 P.2d 325 (1995).  The State argues no violation occurred, and, assuming any violation, the violation was de minimis under *State v. Schierman*, 192 Wn.2d 577, ___ P.3d ___ (2018).  We agree no violation occurred and thus do not address the de minimis contention.

Under our state and federal constitutions, criminal defendants have a right to a public trial. *State v. Lormor*, 172 Wn.2d 85, 90-91, 257 P.3d 624 (2011); U.S. CONST. amend. VI; WASH. CONST. art. I, § 22. Whether a right to a public trial has been violated is a question of law. *State v. Wise*, 176 Wn.2d 1, 9, 288 P.3d 1113 (2012). The error may be raised for the first time on appeal. *State v. Wise*, 176 Wn.2d at 9.

Washington courts have devised a three-part inquiry when determining if a trial procedure violated an accused's right to a public trial: (1) Did the proceeding implicate the public trial right? (2) If so, was the proceeding closed? (3) And if so, was the closure justified? *State v. Smith*, 181 Wn.2d 508, 521, 334 P.3d 1049 (2014). The accused carries the burden of establishing "yes" as the answer to the first two questions. *State v. Love*, 183 Wn.2d 598, 605, 354 P.3d 841 (2015). The proponent of the closure carries the burden of justification. *State v. Love*, 183 Wn.2d at 605.

We first ask whether the voir dire sidebars, during Adam Powell's trial, implicated the public trial right. Courts apply an "experience and logic" test to determine whether the public trial right attaches to a particular proceeding. *State v. Smith*, 181 Wn.2d at 511. Under the experience prong, this court considers whether the challenged proceeding has historically been open to the public. *State v. Sublett*, 176 Wn.2d 58, 73, 292 P.3d 715 (2012). Under the logic prong, this court asks "whether public access plays a significant positive role in the functioning of the particular process in question." *State v. Sublett*, 176 Wn.2d at 73. If we answer "yes" to both questions, the public trial right attaches.

*State v. Whitlock*, 188 Wn.2d 511, 521, 396 P.3d 310 (2017).

When clear precedent has been set by prior case law, this court need not engage in an independent "experience and logic" analysis. *State v. Love*, 183 Wn.2d at 605. We confront two competing lines of cases, one dealing with jury selection, and the other dealing with sidebar conferences.

Adam Powell emphasizes the nature of voir dire. The right to a public trial extends to jury selection, including for cause and preemptory challenges. *State v. Love*, 183 Wn.2d at 605; *State v. Brightman*, 155 Wn.2d 506, 515, 122 P.3d 150 (2005). Unlike administrative or hardship excusals, for cause and peremptory challenges can raise questions about a juror's neutrality and a party's motivation for excusing a juror that implicate the core purpose of the right, and questioning jurors in open court is critical to protect that right. *State v. Love*, 183 Wn.2d at 606 (2015). Open and transparent questioning fosters public confidence in subsequent challenges to jurors and the composition of juries in criminal trials. *State v. Love*, 183 Wn.2d at 606.

The State highlights the nature of sidebar conferences. After applying the experience and logic test, our Supreme Court, in *State v. Smith*, held that traditional sidebar conferences do not implicate the public trial right. The *Smith* court defined "[p]roper sidebars" as proceedings that "deal with the mundane issues implicating little public interest." *State v. Smith*, 181 Wn.2d at 516. The court also cautioned that "[t]o avoid implicating the public trial right, sidebars must be limited in content to their

traditional subject areas, should be done only to avoid disrupting the flow of trial, and must either be on the record or be promptly memorialized in the record." *State v. Smith*, 181 Wn.2d at 516 n.10.

We must navigate between decisions involving sidebar conferences and decisions entailing jury selection. The State asserts that each sidebar during Adam Powell's voir dire process involved ministerial matters, avoided disrupting the flow of jury selection, and was contemporaneously memorialized for the record. We partially agree with the State. The second conference held on January 31 and the final conference held on February 1, functioned as traditional sidebars involving scheduling. The February 1 conference confirmed that selection had ended for purposes of proceeding further with the trial. Thus, those two conferences do not implicate Powell's public trial right. Nevertheless, we agree with Adam Powell that the remaining four bench conferences addressed more than mundane scheduling questions and thereby implicated the public trial right. The remaining conferences involved challenges to potential jurors.

We must next analyze whether a closure occurred during the four remaining sidebars. Adam Powell fails to explicitly analyze this second inquiry of closure. He may argue that a closure must have occurred since the trial court did not record or later memorialize the purpose of the sidebars. The State fails to address this second prong of the inquiry.

We disagree with Adam Powell that the trial court failed to memorialize all four

remaining sidebar conferences. After the first sidebar, the trial court confirmed on the record that the first conference on January 30 involved dismissal of a juror because of a relationship with a witness. The trial court confirmed, on January 31, that the sidebar involved dismissing the juror who explained on the record his disability resulting from the rape and suicide of his daughter. We agree with Powell that the trial court failed to place on the record, at the time of trial, the reasons for the three sidebar conferences on February 1. Nevertheless, the trial court later found, during a special hearing after the commencement of the appeal, that the conferences dealt with a for cause challenge, a *Batson* challenge, and scheduling.

Under Washington law, the trial court may discuss for cause challenges outside the hearing of the jury panel and the public and perform preemptory challenges on paper without an appellate court declaring a closure. *State v. Love*, 183 Wn.2d at 607. The *Love* court stated:

> Yet the public had ample opportunity to oversee the selection of Love's jury because no portion of the process was concealed from the public; no juror was questioned in chambers. To the contrary, observers could watch the trial judge and counsel ask questions of potential jurors, listen to the answers to those questions, see counsel exercise challenges at the bench and on paper, and ultimately evaluate the empaneled jury. The transcript of the discussion about for cause challenges and the struck juror sheet showing the peremptory challenges are both publicly available. The public was present for and could scrutinize the selection of Love's jury from start to finish, affording him the safeguards of the public trial right missing in cases where we found closures of jury section

*State v. Love*, 183 Wn.2d at 607.

21

We deem *State v. Anderson*, 194 Wn. App. 547, 377 P.3d 278 (2016) controlling. In *Anderson*, questioning of jurors occurred in open court, but the defendant challenged prospective jurors for cause at a sidebar conference, and the judge dismissed those jurors. The court made no verbatim record of the sidebars and instead summarized the sidebar proceedings on the record. This court, after remand from the Supreme Court, held no courtroom closure occurred because counsel questioned jurors in open court, courtroom attendees could observe the parties' exercise of juror challenges, and the trial court summarized the sidebar proceedings on the record and in open court. The court concluded that a lack of a transcript did not necessarily render the sidebars a closure.

The only distinction between *Anderson* and our facts is that the trial court did not contemporaneously declare for the record what occurred at the final three sidebars. Nonetheless, one can infer from the record preceding and succeeding the sidebar conferences the subject of the conferences. The trial court later confirmed those purposes.

The Supreme Court, in *State v. Love*, determined important factors in determining a closure to be questioning of jurors in public, exercising challenges on the record, and allowing challenges to be observed. All occurred in Adam Powell's voir dire. Counsel questioned jurors in public, a record exists as to for cause and preemptory challenges, and trial attendees could observe who the parties excused. We prefer that the trial court immediately declare on the record the nature of a sidebar conference after completion of

22

the conference.  Nevertheless, we discern no error in failing to memorialize the content of

a sidebar when we may determine the content by the conference's context.

Aggravated Domestic Violence

Finally, Adam Powell contends the trial court erred when imposing an exceptional

sentence when the State's evidence failed to show beyond a reasonable doubt aggravated

domestic violence.  The trial court gave the following jury instruction number 20:

> To find that either of these crimes is an aggravated domestic
> violence offense, each of the following two elements must be proved
> beyond a reasonable doubt:
> (1) That the victim and the defendant were in a dating relationship;
> and
> (2) That the offense was part of an ongoing pattern of psychological,
> physical, or sexual abuse of the victim manifested by multiple incidents
> over a prolonged period of time.  An "ongoing pattern of abuse" means
> multiple incidents of abuse over a prolonged period of time.  The term
> "prolonged period of time" means more than a few weeks;
> If you find from the evidence that each of these elements has been
> proved beyond a reasonable doubt, then it will be your duty to return a
> verdict of guilty.

CP at 234.

Adam Powell contends that the testimony of Brenda McCoy, Griselda Vaca,

Ernesto Amonzo, and Officer Juan Ceja failed to prove beyond a reasonable doubt that he

psychologically or physically abused Sabrina Flores over a prolonged period of time.  We

disagree.

To reverse an exceptional sentence, this court must find: (1) under a clearly

erroneous standard, insufficient evidence supports the reasons for imposing an

23

exceptional sentence, (2) under a de novo standard, the reasons supplied by the

sentencing court do not justify a departure from the standard range, or (3) under an abuse

of discretion standard, the sentence is clearly excessive or clearly too lenient.  RCW

9.94A.585(4); *State v. France*, 176 Wn. App. 463, 469, 308 P.3d 812 (2013).  We apply

the first standard of review because Adam Powell argues the evidence did not support the

imposition of the exceptional sentence.

In applying the "clearly erroneous" standard in reviewing a trial court's reasons

for imposing an exceptional sentence beyond the standard range, this court will reverse

the trial court's findings only if no substantial evidence supports its conclusion.  *State v.*

*Jeannotte*, 133 Wn.2d 847, 856, 947 P.2d 1192 (1997).  Substantial evidence constitutes

evidence in sufficient quantum to persuade a fair-minded person of the truth of the

declared premises.  *State v. Jeannotte*, 133 Wn.2d at 856; *Olmstead v. Department of*

*Health*, *Medical Section*, 61 Wn. App. 888, 893, 812 P.2d 527 (1991).

We admit the paucity of the written findings of fact of aggravated domestic

violence.  Nonetheless, when a trial court's written findings are incomplete, this court

may look to the trial court's oral findings to aid its review.  *State v. Manion*, 173 Wn.

App. 610, 633, 295 P.3d 270 (2013).  The trial court's oral ruling mentions frequent

screaming and yelling with vulgar language, ramming Sabrina Flores with a car, Flores'

isolation from others, Officer Juan Ceja's response to an earlier domestic violence

24

incident, and Flores' attempting to escape the clutches of Adam Powell. The evidence painted a picture of domestic terror that finally led to homicide.

CONCLUSION

We affirm Adam Powell's conviction for second degree murder and his exceptional sentence based on the aggravated domestic violence factor.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_Fearing, J._

_____
Fearing, J.

WE CONCUR:

_____
Korsmo, J.

_____
Siddoway, J.