[No. 15612-1-II.    Division Two.    February 18, 1994.]

THIEU LENH NGHIEM, *Appellant,* v. THE STATE OF WASHINGTON, ET AL, *Respondents.*

*Don Peter William Taylor* and *Fristoe, Taylor & Schultz Ltd. P.S.,* for appellant.

*Christine O. Gregoire, Attorney General,* and *Ann Marie Neugebauer, Assistant,* for respondents.

MORGAN, C.J. — Dr. Thieu Lenh Nghiem appeals from a superior court decision which affirmed the Washington State Medical Disciplinary Board's revocation of his license. We affirm.

On October 26, 1989, the Medical Disciplinary Board charged Dr. Nghiem with unprofessional conduct. The Board alleged that Dr. Nghiem had asked inappropriate sexual questions of four of his patients. It further alleged that he had had inappropriate sexual contact with three of the four. The Board identified the patients as SM, DA, IK, and DH.

On December 15 to 16, 1989, the Board held a hearing on these allegations. The State called SM, DA, IK, and Dr.

Leslie Rawlings, Ph.D., to testify at the hearing. DH failed to appear, and charges related to her were dismissed.

SM, a registered nurse, testified that in 1988 she was referred to Dr. Nghiem because of problems with her cholesterol. She visited him in January, and they discussed a treatment plan for high cholesterol. According to SM, the questioning then "got a little bit odd with, oh, sexual frequency, if I had climaxes with intercourse, that kind of thing."[1] She visited him again in February, and nothing remarkable occurred. In May, she called to find out why she had not been billed for the January and February visits, and Dr. Nghiem had her make another appointment to see him. During that call, he told her "he enjoyed seeing young beautiful women."[2] She found this comment "weird", but she took it as a joke and kept her appointment, which was for May 20. On that date, Dr. Nghiem told her that she "looked like a model", and that he was "attracted to Scandinavian women".[3] He recommended that she read a certain book (*Loving Through Tao*), asked her if she had "erotic dreams" and "double climaxes", and asked about her sexual relationship with her husband.[4] He gave her a "big hug" and "talked about lasting six hours". She believed he was talking about "controlling his sexual energy" for 6 hours.[5]

Dr. Nghiem then conducted a physical examination. He had SM remove her shirt so he could take her blood pressure. While her shirt was removed, he conducted a "strange" breast exam that consisted of "actually pull[ing] on the whole breast and nipple area". However, he did not appear to be "checking for lumps, cancer, or anything of that nature".[6] He then asked

---

[1]Board R., at 26.

[2]Board R., at 29.

[3]Board R., at 31. SM is Scandinavian. Board R., at 51.

[4]Board R., at 38.

[5]Board R., at 36.

[6]Board R., at 32.

to check her pubic hair pattern. After SM removed one leg from her pantyhose, he had her "kind of bend over, and . . . checked from behind, and then I got on the table."[7] On the table, "he was checking the clitoris, and he commented that I was well endowed; that I had the largest lips he'd ever seen. And then he was, he did an [pelvic] exam. He was checking the muscles in the vaginal wall, G spot".[8] Afterward, he watched SM get dressed and told her she "was a very desirable woman".[9]

Having been with Dr. Nghiem for 3 hours by this time, SM tried to leave. However, Dr. Nghiem followed her to her car in the parking lot, "said that he was really attracted to me. . . . [and] wanted to know if I was attracted to him". When SM told him she was happily married, he "said that he had had, he told me of an encounter he'd had with a married woman, a sexual encounter . . . .. [a]nd the husband had taken it as, he had taken it complimentary".[10] A few days later, Dr. Nghiem called SM at her home to ask her whether she had read the book he had recommended. She and he had no further contact of consequence.

DA, a co-worker of SM, testified that on May 20, 1988, she also visited Dr. Nghiem for high cholesterol problems. After taking some preliminary information, Dr. Nghiem began asking "sexual questions".[11] Specifically, he asked DA if she felt that her "clitoris was large".[12] Noting her Scandinavian name, he "said that he was attracted to Scandinavian women", and that "most oriental men were attracted to Caucasian women".[13] He also asked her "something to do

[7]Board R., at 33.

[8]Board R., at 34.

[9]Board R., at 35.

[10]Board R., at 37.

[11]Board R., at 126.

[12]Board R., at 126.

[13]Board R., at 126.

with my sexual partners, how many I'd had at once, something along that line".[14]

Dr. Nghiem then asked to examine her pubic hair pattern.[15] She agreed to allow him to see the hair pattern on her abdomen. When she undid her pants, he "kind of went down and poked at my abdomen and kind of reached in and pulled my underwear out and looked down a little farther."[16] Flustered, DA fastened her pants and soon left. As she walked out to her car, Dr. Nghiem followed her and showed her "transfer of energy by giving [her] a hug".[17] She and he had no further contact of consequence.

IK testified that she was referred to Dr. Nghiem for puffiness around her fingers and ankles. While she was in his office in the summer of 1988, he had her remove her sweater so he could take her blood pressure. While she sat in his office in only her bra, Dr. Nghiem asked:

> How often I had sex, when was the last time I had sex, was I married, did I have a boyfriend, what kind of sex did I like, what positions did I like, have I ever had group sex, and how many guys could I handle at one time.[18]

When she asked Dr. Nghiem why these questions were pertinent to her condition, he had no response. She asked if she could put her sweater back on, but Dr. Nghiem repeatedly said, "Not yet". After about 20 minutes, she clothed herself and left. She and he had no further contact of consequence.

Prior to the hearing in December 1989, Dr. Rawlings, a clinical psychologist, evaluated Dr. Nghiem at the Board's behest. Dr. Rawlings had read the complaints filed by SM, DA, IK, and DH, had interviewed Dr. Nghiem on a number of occasions, and had had Dr. Nghiem take a battery of

---

[14]Board R., at 127.

[15]Dr. Nghiem explained that this was necessary to determine "hormonal problems and had something to do with [DA's] cholesterol". Board R., at 129.

[16]Board R., at 129.

[17]Board R., at 130-31.

[18]Board R., at 144-45.

psychological tests. Dr. Rawlings concluded in a prehearing report:

> Dr. Nghiem is at significant risk for engaging in similar conduct with other patients. Given his denial of having engaged in any inappropriate behavior and the assaultive character of some of the behavior, including the digital penetration of one of the patients, there is considerable potential risk to other patients. It is recommended that Dr. Nghiem vacate his practice.

Board R., at 380.

At the hearing before the Board, Dr. Rawlings testified consistently with his report. His report was also admitted.

Dr. Nghiem presented a number of witnesses who testified to his good character and reputation in the community. Testifying in his own defense, he denied the allegations made by all three women. He said, however, that he had spoken with SM in a clinical way about her relationship with her husband. He also said he had asked IK questions of a sexual nature, because he was concerned she might have a sexually transmitted disease. He said the only reason he had IK remove her arm from her sweater was so he could take her blood pressure. Dr. Nghiem also presented a psychologist, Dr. S. Harvard Kaufman, who had evaluated Dr. Nghiem at his behest. Dr. Kaufman testified that Dr. Nghiem had denied the allegations of sexual contact, but had admitted asking sexually oriented questions. Dr. Kaufman testified, based upon the assumption that there had been no sexual contact, that Dr. Nghiem "did not exercise good judgment" and would need counseling and supervision if he remained in medical practice. Dr. Kaufman conceded that if the women's allegations were true and Dr. Nghiem's denials false, "he's not fit to practice".[19]

On February 28, 1990, the Board promulgated written findings that included the following:

> 1.3 That during 1988, respondent had inappropriate sexual contact, including digital penetration of the vagina, and inappropriately posed questions of a sexual nature to . . . S.M., while respondent was evaluating S.M. for high cholesterol.

---

[19]Board R., at 116.

1.4 During 1988, respondent inappropriately examined the genital area and inappropriately posed questions of a sexual nature to . . . D.A. The examination and questioning took place in respondent's office while respondent was evaluating D.A. for high cholesterol.

1.5 That during 1988, respondent conducted an inappropriate examination of . . . I.K., by having her sit partially clothed, with her sweater removed and without a patient gown, for a prolonged period of time in respondent's office, while respondent was present and asking her other questions.

Board R., at 13-14. The Board concluded that Dr. Nghiem had engaged in unprofessional conduct within the meaning of RCW 18.130.180(1) and (24). Those sections provide in pertinent part:

The following conduct, acts, or conditions constitute unprofessional conduct for any license holder or applicant under the jurisdiction of this chapter:

(1) The commission of any act involving moral turpitude . . ..

. . . .

(24) Abuse of a client or patient or sexual contact with a client or patient[.]

Based on RCW 18.130.160, the Board revoked Dr. Nghiem's license. It also ordered that the revocation last at least 10 years, after which Dr. Nghiem could petition for reinstatement if he supplied "proof of rehabilitation".

Dr. Nghiem appealed to the Superior Court, which affirmed the Board's order. It concluded that the Board's findings of fact were supported by substantial evidence, and that its conclusions were "not affected by error of law". Dr. Nghiem then appealed to this court.

I

Dr. Nghiem first contends the Board's findings of fact are not supported by substantial evidence. We disagree.

■■ We review the findings of the Board, and not the findings of the Superior Court. *Franklin Cy. Sheriff's Office v. Sellers*, 97 Wn.2d 317, 324, 646 P.2d 113 (1982), *cert. denied*, 459 U.S. 1106 (1983); *Farm Supply Distribs., Inc. v. State Utils. & Transp. Comm'n*, 83 Wn.2d 446, 518 P.2d 1237 (1974). We review findings of fact to determine whether they are supported by substantial evidence. RCW 34.05.570(3)(e).

We review conclusions of law de novo. *See Lejeune v. Clallam Cy.*, 64 Wn. App. 257, 263, 823 P.2d 1144, *review denied*, 119 Wn.2d 1005 (1992). Substantial evidence is "evidence in sufficient quantum to persuade a fair-minded person of the truth of the declared premises". *Olmstead v. Department of Health*, 61 Wn. App. 888, 893, 812 P.2d 527 (1991) (quoting *Green Thumb, Inc. v. Tiegs*, 45 Wn. App. 672, 676, 726 P.2d 1024 (1986)).

We hold that the Board's findings of fact are supported by substantial evidence. The Board was charged with the responsibility of evaluating the credibility of witnesses. It accepted the testimony of SM, DA, and IK. That testimony clearly demonstrated that Dr. Nghiem had engaged in inappropriate sexual contact with SM, had inappropriately examined DA and IK, and had asked inappropriate sexual questions of all three. The Superior Court did not err in upholding the Board's findings.

## II

Dr. Nghiem argues that the "Board and the Court erroneously concluded that the conduct of Appellant . . . constituted unprofessional conduct."[20] He says, "All of Appellant's questions were medically appropriate to enable him to make a proper diagnosis."[21] As he makes this argument, he does not mention the inappropriate physical examinations of all three women, or the sexual contact with S.M.

As already noted, RCW 18.130.180(1) defines any act of moral turpitude as an act of unprofessional conduct. Dr. Nghiem acknowledges that our Supreme Court has interpreted this statute "as prohibiting conduct indicating unfitness to practice the profession".[22] Here, the Board found, as discussed above, that Dr. Nghiem had engaged in inappropriate sexual contact with SM., in inappropriate physical examinations of all three women, and in inappropriate sexual

[20]Br. of Appellant, at 21.

[21]Br. of Appellant, at 21.

[22]Br. of Appellant, at 21; *see Haley v. Medical Disciplinary Bd.*, 117 Wn.2d 720, 818 P.2d 1062 (1991).

questioning of all three women. If valid, as we have held they were, these findings amply support a conclusion of unprofessional conduct and, indeed, of professional unfitness. The Board did not err in drawing the conclusions that it did, and the Superior Court did not err in upholding those conclusions.

## III

▇ SM was allowed, over Dr. Nghiem's relevancy objection, to testify that some months after May 20, 1988, she became very upset when she saw a man who resembled Dr. Nghiem. Dr. Nghiem argues this was improper, but has not assigned error to the admission of the testimony. *See* RAP 10.3; *McKee v. American Home Prods. Corp.*, 113 Wn.2d 701, 705, 782 P.2d 1045 (1989) (issue not supported by assignment of error need not be considered). More importantly, the testimony had extremely minor significance in light of the overall evidence, which was overwhelming. Even if we assume its admission was error, the error was harmless beyond any doubt.

## IV

Dr. Nghiem makes two arguments that question the Board's power to condition its order of revocation. First, he argues that the Board exceeded its authority when it provided in its order of revocation that he could not be reinstated for at least 10 years. Second, he argues that the Board exceeded its authority by conditioning reinstatement on proof of rehabilitation. At least in part, he bases these arguments on the proposition that an order of revocation is equivalent to a "professional execution", and that "[o]nce the execution has occurred, nothing remains to be done until the resurrection, if any." Br. of Appellant, at 26.

▇ This first argument is unpersuasive when considered in light of the specific provisions in RCW 18.130. Former RCW 18.130.160 states in part:

> Upon a finding that a license holder or applicant has committed unprofessional conduct . . . the disciplining authority may issue an order providing for one or any combination of the following:
>
> (1) Revocation of the license; . . ..

RCW 18.130.150 states in part:

> A person whose license has been suspended or revoked under this chapter may petition the disciplining authority for reinstatement *after an interval as determined by the disciplining authority in the order.*

(Italics ours.)[23] Read together, these statutes give the Board power to establish an interval that must elapse before the licensing board can consider reinstatement, even when it is entering an order of revocation as opposed to an order of suspension.

The second argument is also unpersuasive when considered in light of the statutes. RCW 18.130.160 states in part that after adopting sanctions that protect the public, a disciplining authority may consider and include in its order requirements designed to rehabilitate the license holder or applicant. RCW 18.130.120 states in part:

> The department shall not issue any license to any person whose license has been denied, revoked, or suspended by the disciplining authority *except in conformity with the terms and conditions of the certificate or order of denial, revocation, or suspension . . ..*

(Italics ours.) These statutes necessarily imply that the Medical Disciplinary Board, in an order of revocation, has authority to condition reinstatement.

Dr. Nghiem's remaining arguments lack merit and will not be discussed.

Affirmed.

ALEXANDER and HOUGHTON, JJ., concur.

---

[23]According to the Board's counsel at oral argument, this provision exists because the board that licenses doctors is different from the board that disciplines doctors; without it, a doctor revoked by the one board might immediately be reinstated by the other.