IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>               Respondent,<br><br>       v.<br><br>RIGO ROBERTO CORTEZ,<br><br>               Appellant. | No. 84744-9-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

DÍAZ, J. — A jury convicted Rigo Roberto Cortez of three counts of child molestation against his granddaughter, R.A.C.[1]  He now argues (1) there is insufficient evidence to support the jury's decision on two of the convictions; (2) the trial court misapplied ER 404(b) by admitting testimony of two additional, unwanted, and uncharged sexual touchings; (3) the trial court's jury instructions improperly allowed the jury to convict him on multiple charges for the same act, violating his right to be free from double jeopardy; and (4) several conditions of his sentence violate his constitutional rights, asking also that we remand the matter to strike two fees the court imposed.  We hold that none of his assignments of error are meritorious, except that we remand this matter for the court to strike those fees.

---

[1] We refer to R.A.C. by her initials to protect her privacy.

## I.    BACKGROUND

R.A.C. was born in 2007.   Cortez is her step-grandfather, i.e., Cortez's stepson is R.A.C.'s father.   R.A.C. and her mother lived with Cortez at different points of R.A.C.'s childhood.   During the approximately nine-year period when R.A.C. lived with Cortez off and on, he sometimes cared for her.

In December 2019, when R.A.C. was 12 years old and in seventh grade, she reported to two friends and then to her school counselor that Cortez touched her inappropriately multiple times.

As we will discuss in more detail below, ultimately, the State charged Cortez with two counts of child molestation in the first degree for incidents occurring between April 2012 and April 2019 (counts 1 and 2).   And the State charged Cortez with two counts of child molestation in the second degree for incidents occurring between April 2018 and December 2019 (counts 3 and 4).   Count 3 was the same type of act as in count 2, but in a different location and time, although the events occurred within overlapping time periods, namely, April 2018 and April 2019.

The jury acquitted Cortez of count 1, but found him guilty of counts 2, 3, and 4.   The trial court imposed terms of confinement, restitution—neither of which are challenged here—and conditions of community custody, which he does challenge.   Cortez timely appeals.

## II.    ANALYSIS

### A.    Sufficiency of the Evidence

#### 1.  Law

"The standard for sufficiency of evidence is 'whether any rational trier of fact

2

could have found the essential elements of the crime beyond a reasonable doubt when viewing the evidence in a light most favorable to the State.'" State v. Gantt, 29 Wn. App. 2d 427, 441-42, 540 P.3d 845, 855 (2024) (quoting State v. Treat, 109 Wn. App. 419, 426, 35 P.3d 1192 (2001)). "And a key tenant of our justice system is that 'a jury is free to believe or disbelieve a witness, since credibility determinations are solely for the trier of fact.'" Id. (quoting Morse v. Antonellis, 149 Wn.2d 572, 574, 70 P.3d 125 (2003)). "Further, an appellate court 'must defer to the trier of fact for purposes of resolving conflicting testimony and evaluating the persuasiveness of the evidence.'" Id. (quoting State v. Homan, 181 Wn.2d 102, 106, 330 P.3d 182 (2014)).

A person is guilty of child molestation in the first degree, in pertinent part, when the person has sexual contact with another who is less than 12 years old and the perpetrator is at least 36 months older than the victim. RCW 9A.44.083(1). A person is guilty of child molestation in the second degree when the person has sexual contact with another who is at least 12 years old but less than 14 years old and the perpetrator is at least 36 months older than the victim. RCW 9A.44.086(1). "Sexual contact" means "any touching of the sexual or other intimate parts of a person done for the purpose of gratifying sexual desire of either party or a third party." RCW 9A.44.010(13).

2. Additional Factual Background

Starting when R.A.C. was five years old, and from 2010 to 2012, R.A.C. and her mother lived with Cortez and other family members in an unnamed apartment. In approximately 2012, Cortez moved out and did not live with R.A.C. and her

mother for a few years. Then, in 2015, Cortez and his wife moved into the "Dashpoint apartments" with R.A.C. and her mother. Then, in 2019, they all moved to a duplex together.

R.A.C. testified that, when she was nine or 10 years old and living in the Dashpoint apartments with her mother and Cortez, Cortez touched two of R.A.C.'s body parts. She stated, "We'd be sitting on a couch together watching TV, and he would slide his hand, like, on my inner thigh. And, yeah, things like that. He would try to put his hand down my bra." More specifically, as to the inner thigh, she testified that Cortez would "palm" R.A.C.'s thigh on top of her clothes and slide his hand down closer to her vagina, which made R.A.C. uncomfortable. As to the breast, Cortez would put his hand under R.A.C.'s shirt and try to touch her breast, stopping right above the nipple before she "stopped him," by pushing him away. She testified that Cortez touched R.A.C. in these ways on almost a daily basis. The State charged this series of touchings in the Dashpoint apartments as count 2.

While there may have been a period of time when Cortez lived elsewhere, the whole family began to live together again in a duplex when R.A.C. was in fourth grade. Cortez continued to touch R.A.C., testifying, "it was basically the same thing. You know, going under my bra and touching my inner thigh." She testified that Cortez would try and "give up eventually" after R.A.C. pushed him away. Id. at 998. The State charged these touchings in the duplex as count 3.

R.A.C. also testified about another incident when she was sweeping the kitchen, stating that Cortez grabbed her from behind and "pressed himself against"

4

her for a few seconds. Cortez pressed himself against her in such a way that R.A.C. could feel his penis pressed against her buttocks. Cortez did not grab her in that way again. The State charged this incident as count 4.

3. Discussion

Generally, Cortez argues R.A.C.'s testimony is insufficient to support his convictions for child molestation. Cortez offers different types of arguments for counts 2 and 3 than for count 4. We address each type in turn.

As to counts 2 and 3, Cortez argues that there is insufficient evidence to establish child molestation because the evidence does not prove he touched R.A.C.'s "intimate parts." RCW 9A.44.010(13). Cortez further distinguishes between the touching of R.A.C.'s breasts and her inner thighs, claiming each was insufficiently intimate in different ways.

As to the breasts, Cortez argues that the evidence does not establish sexual contact of an "intimate part" because the evidence does not show he actually touched her nipples and, thus, he only *attempted* to touch her breasts. Cortez relies, for example, on R.A.C.'s following statement: "he would try to put his hands under my bra to touch my boob, but he never really got to really grab it since I stopped him."

This argument fails for two reasons. First, Cortez's argument is factually incorrect because, as to both counts, Cortez actually did touch R.A.C.'s breasts because he touched the top of the breasts, just above the nipple. For example, she testified:

> Q: Did you feel his hand touch your skin any lower than that upper
> chest area?

5

A: Yes.

Q: Where did you feel his hands ultimately get to?  How far down did they get? . . .

A: Above the nipple.. . .

Q: Did you feel his fingers actually underneath your bra?

A: Yes.

Thus, we conclude this touching was sufficient for a rational jury to conclude he touched an "intimate part" under RCW 9A.44.010(13)).

Second, even if we were to accept his definition of "breast" as consisting only of the nipple, and thus he only "attempted" to unsuccessfully molest her, Cortez still touched a body part "in close proximity to the primary erogenous areas" when he "put his hand down [her] bra." State v. Powell, 62 Wn. App. 914, 917 n.3, 816 P.2d 86 (1991) ("[t]he term 'intimate parts' has been interpreted to have a broader connotation than sexual and to include 'parts of the body *in close proximity* to the primary erogenous areas . . .'" (emphasis added)); Therefore, the jury had sufficient evidence to find that Cortez touched her breasts or parts in "close proximity" thereto.

As to the thighs, Cortez argues that touching R.A.C. on her clothed thigh does not by itself support the conclusion that child molestation occurred. Specifically, Cortez argues that, even if the thigh qualifies as "an intimate body part," that such "touching does not by itself establish intent for sexual gratification." Cortez argues there must be additional proof that the touching was intended for sexual gratification, such as heavy breathing or a rubbing motion.  Cortez also

asserts that "[t]ouching a grandchild's thigh over the clothing while watching TV is not inherently sexual or inappropriate," particularly when he was engaged in a "caretaking function." And, similarly to the argument above, Cortez avers that "any touching of [R.A.C.'s] thigh was fleeting because [R.A.C.] would push Mr. Cortez's hand away."

Indeed in Powell, this court concluded that a defendant's touching of a child's clothed thighs *may* be susceptible to an innocent explanation and, without more, *may* be insufficient evidence of touching for sexual gratification. 62 Wn. App. at 918. However, Powell's requirement for an "additional showing" of sexual intent expressly excludes touching of erogenous zones and, per above, body parts "close proximity" thereto. Id. at 917. That is, if the defendant touches those areas, an additional showing of sexual intent is unnecessary.

Here, R.A.C. testified that when Cortez touched her thigh, he slid his hand down toward her vagina before she stopped him. We hold that a rational jury could find that such a touching was close enough to an erogenous zone to be considered sexually motivated. Gantt, 29 Wn. App. 2d at 441-42. Moreover, Cortez points to nothing in the record to explain why he would continually touch his granddaughter's thigh (or breast) in that manner for caretaking purposes. Viewing the evidence in a light most favorable to the State, it would not be an irrational inference for a jury to find Cortez was sexually motivated when doing so.

As to this alleged caretaking function, Cortez further attempts to contrast this court's holding in State v. Harstad, 153 Wn. App. 10, 16, 218 P.3d 624 (2009). Br. of App. at 17. Our decision in Harstad does not bolster Cortez's argument and,

in fact, undermines his argument. There, the defendant was convicted of child molestation for touching his son's girlfriend's children's various parts of their body when the children slept under blankets. 153 Wn. App. at 16-18. This court held that "[c]overing a child with a blanket could be seen as caretaking, but it *is not the kind* of caretaking that requires close contact with an unrelated child's intimate parts. Covering a child with a blanket in order to hide inappropriate touching is, put simply, not caretaking." Id. at 23 (emphasis added). Similarly, we hold that watching television, as it is commonly performed, "is not the kind of caretaking" that requires close contact with a child's breasts or inner thighs. Id.; see also State v. Wilson, 56 Wn. App. 63, 68, 782 P.2d 224 (1989) ("the fact finder may also consider the circumstantial evidence surrounding the touching.").

Turning to count 4 (Cortez hugging R.A.C. from behind), Cortez similarly avers that there is insufficient evidence to show that Cortez touched R.A.C. for the purpose of sexual gratification. He argues that the "evidence [was] equivocal. It [was] consistent with Mr. Cortez, a caretaker, merely giving [R.A.C.] a hug from behind." This argument is again factually and legally unavailing.

In fact, R.A.C. testified:

> A: . . . He was in the living room and he came in the kitchen. And when I was sweeping, like, he came behind me and, like, pressed himself against me.
>
> Q: What part of his body did you feel pressed up against you?
>
> A: I felt his private part. So his -- his penis. Yeah, that's what I felt, like, pressed against my butt as I was sweeping.
>
> Q: As you were sweeping. Do you remember about how

> long you felt his penis pressed up against your -- and
> you said it was pressed up against your butt?
>
> A: Yes.  It was like a few seconds.

The State, not inaccurately, characterizes this testimony as Cortez "press[ing] his penis into his granddaughter's clothed buttocks."

When viewing the evidence in the light most favorable to the State we conclude that that State's interpretation of his behavior is one which a rational jury could reach, which would permit it to conclude that the touching was done for sexual gratification.  Treat, 109 Wn. App. at 426.  And, Cortez points to nothing in the record to support his claim that he was engaged in caretaking of some kind.

Finally, Cortez also argues that counts 2 and 3 are not supported by sufficient evidence because R.A.C.'s testimony was overly "generic," i.e., it did not sufficiently differentiate between specific events.  "In sexual abuse cases where the State alleges multiple acts within the same charging period, the State need not elect *particular acts* associated with each count so long as the evidence clearly delineates *specific and distinct incidents* of sexual abuse during the charging periods."  State v. Edwards, 171 Wn. App. 379, 401, 294 P.3d 708 (2012) (quoting State v. Hayes, 81 Wn. App. 425, 431, 914 P.2d 788 (1996)) (emphasis added).

Here, as will be discussed in further detail below, R.A.C. did testify to a series of ongoing touchings by Cortez, but the State delineated counts 2 and 3 by the location and time periods in which they occurred.  Namely, in its closing argument, the State explained that count 2 referred to

> the incidents of general touching and repeated touching that
> occurred at the Dashpoint Apartments when she was between the
> ages of 9 and 10.

9

And, the State delineated count 3 as

> the repeated and general touching that occurred in the home that she's living in now, after she moved out of the Dashpoint Apartment and into [the duplex] in 2017 where she lived all the way up until her 12th birthday and after.

Moreover, courts apply a three-part test to determine whether a *child's* testimony about repeated sexual touching is "generic," namely:

> First, the alleged victim must describe the kind of act or acts with sufficient specificity to allow the trier of fact to determine what offense, if any, has been committed. Second, the alleged victim must describe the number of acts committed with sufficient certainty to support each of the counts alleged by the prosecution. Third, the alleged victim must be able to describe the general time period in which the acts occurred. The trier of fact must determine whether the testimony of the alleged victim is credible on these basic points.

Hayes, 81 Wn. App. at 438.

Although there is an overlapping time period in the charging documents, we conclude R.A.C.'s testimony for counts 2 and 3 is sufficiently specific because (1) she described the acts specifically by describing how he touched her breasts and thigh, (2) she described the acts as almost "daily" whenever they watched television, and (3) she described the general time period in which the acts occurred demarcated both by her age and her location of residence at the time.

In short, we hold that there was sufficient evidence to persuade a rational jury that Cortez committed the essential elements of the crime beyond a reasonable doubt. Gantt, 29 Wn. App. 2d at 441-42.[2]

---

[2] Cortez filed a statement of additional grounds ("SAG"), in which he appears also to argue that the trial court did not support its verdict with substantial evidence, stating "the prosecutor only accused me and did not give any evidence or dates,"

10

B.      Testimony of Two Prior Un-Charged Incidents

  1.  Additional Factual Background

Before trial, the court granted the State's motion to admit R.A.C.'s testimony about two uncharged incidents where Cortez touched her.  In the first incident, R.A.C. testified:

> I remember I was around 10.  But he wasn't living with us at the time, he was living . . . [in] a little cabin outside in his friend's yard . . .  But I remember -- I don't exactly remember what he did or tried to do.  But we were left alone in the little cabin, and I remember telling him that if he did that one more time, I would have called the police.

When asked how Cortez responded to that statement, R.A.C. testified that Cortez "told me that he was just joking.  He was just playing around."

In the second incident, R.A.C. testified:

> I'm pretty sure my grandma sent [Cortez] to get a diaper for my little brother.  And when he went up there, I was there on my mom's bed sleeping, and he went onto the bed and laid on me.  He put his whole weight on me and he kissed me on the lips and I pushed him off and that's when he left back downstairs.

Cortez objected to the admission of this testimony, arguing the State offered this testimony simply to show Cortez's lustful disposition toward R.A.C., contrary to State v. Crossguns, 199 Wn.2d 282, 505 P.2d 529 (2022).  Cortez further argued

---

and that no one "gave her an exam" (presumably, referring to R.A.C.).  Without citing any evidence in the record, Cortez also seeks to undermine unnamed witnesses' credibility, claiming "that the people accusing me have filed to legalize their status in the USA and used me to do so."  Viewing the evidence in the light most favorable to the State, as we must, a rational trier of fact could find R.A.C. and (as we will discuss below) Cortez's wife's testimony credible and sufficient to sustain the verdicts.  Treat, 109 Wn. App. at 426.  Further, Cortez's questioning of some witnesses' alleged motives in testifying is rankly conclusory and not sufficient to meet his burden to show a jury could not have rationally based its verdict on the totality of the evidence.  Cortez makes no other cogent arguments.  Thus, his SAG fails.

that, even if there was some proper purpose for this evidence, its admission was still substantially outweighed by the unfair prejudice to him. The court found that "the probative value . . . goes to intent . . .[,] that he was put on notice and that behavior continued . . . [a]nd [to] the absence of mistake."

2. Discussion

"Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. 'It may, however, be admissible for other purposes.'" Gantt, 29 Wn. App. 2d at 446 (quoting ER 404(b)).

We assume, without deciding, that R.A.C.'s testimony of regarding these two uncharged incidents are "other" wrongs or acts which the trial court had no proper purpose for which to admit them under ER 404(b). But, we conclude that the trial court's admission of these acts was harmless, for four reasons.

"In analyzing the erroneous admission of evidence in violation of ER 404(b), we apply the nonconstitutional harmless error standard." State v. Gunderson, 181 Wn.2d 916, 926, 337 P.3d 1090 (2014). The nonconstitutional harmless error standard "asks whether 'within reasonable probabilities, had the error not occurred, the outcome of the trial would have been materially affected.'" State v. Bartch, 28 Wn. App. 2d 564, 575, 537 P.3d 1091 (2023), review denied, 544 P.3d 29 (2024) (quoting Gunderson, 181 Wn.2d at 926). "The improper admission of evidence constitutes harmless error if the evidence is of minor significance in reference to the overall, overwhelming evidence as a whole." Id. at 575 (citing Thien Lunh Nghiem v. State, 73 Wn. App. 405, 413, 869 P.2d 1086

(1994)). "In assessing whether the error was harmless, we must measure the admissible evidence of [the defendant's] guilt against the prejudice, if any, caused by the inadmissible testimony." State v. Bourgeois, 133 Wn.2d 389, 403, 945 P.2d 1120 (1997).

First, we conclude that the potential prejudice caused by this arguendo inadmissible testimony is of minor significance when measured against the admissible evidence of Cortez's guilt. As reviewed above, R.A.C.'s testified to repeated, regular touchings over a period of nearly seven years. R.A.C. described in significant detail the potentially hundreds of incidents of "daily" improper touchings, in a manner which identified clearly the body parts touched and which delineated the time and place of the assaults. In contrast, she described the two one-time incidents briefly and vaguely, in terms of the kind of touching that occurred (in the cabin) or when and where it occurred (in the bedroom). Indeed, R.A.C. testified that the incident in the bedroom was the only time Cortez laid on her and kissed her lips. In short, the breadth and specificity of R.A.C.'s admissible testimony supporting Cortez's guilt overwhelmed the potential prejudice of her arguendo inadmissible testimony.

Further, the jury heard testimony from Cortez's wife who confirmed she was aware of R.A.C.'s allegations and chastised him as follows:

Q. Ms. Garcia, when you told Mr. Cortez what [R.A.C.] had told you about what happened in [her daughter's] apartment, what do you remember telling him?

A. What I said to my husband?

Q. Yes.

13

A. Well, I call her Tweedy and I told him that Tweedy said that someone touched her at night. So I told him -- I told him, you know, *you can't go around doing things like that* because here it's a very dangerous country and you -- *you can't do things like that here*. So I said that to him and he said, I – I wouldn't be able to do that.

Q. Now, when you said you told him that, you told him that you can't go around doing things like that here, did you mean like here as in the United States?

A. Yes.

(Emphasis added).

When confronted with this evidence at trial, Cortez simply denied ever touching R.A.C. In fact, Cortez categorically denied ever being alone watching television with R.A.C. He also denied that his wife asked him if he touched R.A.C. Cortez otherwise put on no substantive defense.

When considering the breadth of R.A.C.'s "detailed" testimony, "the jury's opportunity to assess [Cortez's] credibility," and the "damning" nature of his wife's admissible testimony, we cannot say, with any reasonable probability, that the admission of R.A.C.'s arguendo inadmissible limited testimony would have materially affected the outcome of the trial had they been excluded. State v. Gresham, 173 Wn.2d 405, 425, 269 P.3d 207 (2012).

Second, unlike in Bartch, the State did not frame its theory around Cortez having an uncontrollable sexual attraction to R.A.C. throughout the trial. 128 Wn. App. 2d at 576. The State did not even refer to either incident in its closing argument, unlike in Bartch, where prior incidents of sexual touching were a focal point of the State's overall theory. Id. Instead, the State emphasized the daily and "repeated" touchings at the Dashpoint apartment, the duplex, and (as to count 4)

14

the incident where Cortez pressed himself against her from behind. These facts further undermine the possibility that the admission of these two incidents materially affected the outcome.

Third, the jury found Cortez guilty of counts 2 through 4, but found him not guilty of count 1, another incident of unwanted touching that R.A.C. testified to. The jury's findings show that the two uncharged incidents were not so prejudicial that they affected the entire verdict. In that way, that evidence was of minor significance, both to guilt and non-guilt. Nghiem, 73 Wn. App. at 413.

Fourth, after the State rested, the State suggested that the court give a limiting instruction regarding these incidents. The proposed instruction to the jury stated:

> You may have heard evidence concerning alleged misconduct by the defendant, that the State alleges occurred during the time period when the charged incidents were alleged to have been committed. Such evidence may only be considered by you to the extent that you find it relevant to the issues of intent and opportunity it is not to be considered by you for any other purpose.

11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL 5.30 cmt. (5th ed. 2021).

Cortez declined the instruction, stating, "Your honor, I don't agree that this instruction should be given at this point. I think that it's too vague to be helpful to the jury with respect to what specific evidence is being discussed." Had his counsel considered in real time that this arguendo inadmissible testimony was so prejudicial that it would have affected the outcome of the trial, it would have been unlikely that Cortez would have declined an instruction without offering a more

15

specific alternative.[3] This fact too then supports our conclusion that the testimony was of minor significance as compared to the admissible evidence.

In short, we conclude that it is not reasonably probable that the admission of the two incidents materially affected the outcome of the trial. Bartch, 28 Wn. App. 2d at 575. Ultimately, they were of minor significance compared to the overall, overwhelming evidence as a whole. Nghiem, 73 Wn. App. at 413.

C.    Double Jeopardy

  1.  Law

"The constitutional guaranty against double jeopardy protects a defendant . . . against multiple punishments for the same offense." State v. Reedy, 26 Wn. App. 2d 379, 387, 527 P.3d 156 (2023), review denied, 534 P.3d 798 (2023) (quoting State v. Noltie, 116 Wn.2d 831, 848, 809 P.2d 190 (1991)); U.S. CONST. amend. V; WASH. CONST. art. I, § 9. "However, '[i]f one crime is over before another charged crime is committed, and *different* evidence is used to prove the second crime, then the two crimes are not the 'same offense' and a perpetrator may be punished separately for each crime without violating a defendant's double jeopardy rights.'" Id. (quoting Noltie, 116 Wn.2d at 848).

"A so-called 'separate and distinct' jury instruction is one where the court

---

[3] That said, we do believe that the trial court should have issued a limiting instruction for both incidents and, as Cortez's counsel accurately stated, "it's most appropriate to ask for the limiting instructions to be given around the time that that testimony comes in, as it allows the jury to contextualize what's coming before it or immediately thereafter." "Although it is usually preferable to give a limiting instruction contemporaneously with the evidence at issue, it is within a trial court's discretion to choose instead to give a limiting instruction at the close of all of the evidence." State v. Ramirez, 62 Wn. App. 301, 304, 814 P.2d 227 (1991). Neither occurred here, though that fact is not dispositive of our analysis.

informs the jury that each crime requires proof of a different act." Id. (citing State v. Mutch, 171 Wn.2d 646, 663, 254 P.3d 803 (2011)). "In other words, a separate and distinct instruction informs the jury that, to convict, 'one particular act has [to be] proved beyond a reasonable doubt for each count.'" Id. at 387-88 (quoting Mutch, 171 Wn.2d at 663). "Where jury instructions are 'lacking for their failure to include a "separate and distinct" instruction' they *may* be flawed." Id. at 388 (quoting Mutch, 171 Wn.2d at 663) (emphasis added). "'However, flawed jury instructions that *permit* a jury to convict a defendant of multiple counts based on a single act do not necessarily mean that the defendant received multiple punishments for the same offense; it simply means that the defendant *potentially received* multiple punishments for the same offense.'" Id. (quoting Mutch 171 Wn.2d at 663) (some emphasis added).

"Our Supreme Court has 'disapproved' of the Court of Appeals looking only at the jury instructions and conducting no further inquiry into the record." Id. (quoting Mutch 171 Wn.2d at 663-64). "On review, the court may consider insufficient instructions 'in light of the full record' to determine if the instructions 'actually effected a double jeopardy error.'" State v. Peña Fuentes, 179 Wn.2d 808, 824, 318 P.3d 257 (2014) (quoting Mutch, 171 Wn.2d at 661-63). "This court has refused to find error when it is 'manifestly apparent to the jury that each count represent[s] a separate act.'" Id. at 824 (quoting Mutch, 171 Wn.2d at 665-66). Three cases illuminate the concept of "manifestly apparent."

In Mutch, our Supreme Court concluded the jury instructions and the manner in which the facts were presented at trial violated the double jeopardy

clause because the instructions "failed to include sufficiently distinctive 'to convict' instructions" for each rape count, and the counts were "nearly identical, including that they all indicated the same time of occurrence of the criminal conduct, between 'the 2nd day of February, 1994 and the 3rd day of February, 1994.'" 171 Wn.2d at 662.

Conversely, in Peña Fuentes, our Supreme Court found it was manifestly apparent the multiple convictions were based upon separate acts because the State, in closing argument, "made a point to clearly distinguish between the acts that could constitute rape of a child and those that would constitute child molestation." 179 Wn.2d at 825. The court held that the manifestly apparent standard is satisfied when, in closing argument, the State identifies specific acts and identifies them as separate and distinct from each other. Id.

Similarly, in State v. Daniels, in its presentation of the evidence, "the State distinguished between different geographic locations (Seattle and Tacoma) and between different time periods (before and after Daniels knew the victim was underage) to support convictions for two separate charges." 183 Wn. App. 109, 119, 332 P.3d 1143 (2014). And the State reiterated the same in its closing argument. Id.

"Double jeopardy challenges are reviewed de novo." Reedy, 26 Wn. App. 2d at 389 (quoting Mutch, 171 Wn.2d at 661-62).

2. Discussion

Cortez argues that the jury instructions did not make clear that the acts underlying each count had to be considered separately from each other count.

Specifically, he avers the court's "separate and distinct" instructions distinguished each count only from a single other count (e.g., 1 from 2, and 3 from 4), but not from *all the other* counts (e.g., 2 from 3).[4] This failure meant that a jury rightly would not convict him of counts 1 and 2 for the same act (and thus there was no double jeopardy concerns between the same degree of charges), but the jury *could* have convicted on counts 2 and 3 for same act, violating his double jeopardy rights.

And, Cortez argues the failure to distinguish between the charges was aggravated by the overlap between the charging periods for each count. Relevantly, the charging period for counts 1 and 2 (child molestation in the first degree) overlapped with the charging period for counts 3 and 4 (child molestation in the second degree) by one month, i.e., when it required the jury to find:

> That the defendant . . . on or about the period *between April 17, 2012 and April 16, 2019* . . . had sexual contact for the purpose of sexual gratification, with R.A.C.
> (counts 1 and 2)
>
> That the defendant . . . on or about the period between *April 17, 2018 and December 16, 2019* . . . had sexual contact for the purpose of sexual gratification with R.A.C.
> (counts 3 and 4)

(emphasis added).

The State acknowledges that the instructions made it possible that the jury

---

[4] For example, the to-convict instruction for count 3 read: "To convict the defendant of the crime of child molestation in the second degree in count 3 each of the following elements of the crime must be proved beyond a reasonable doubt: (1) That on or about on or about the period between April 17, 2018 and December 16, 2019, *on an occasion separate and distinct from Count 4*, the defendant had sexual contact with R.A.C." (Emphasis added). Thus, if it followed this instruction, a jury would not convict Cortez for same act on counts 3 and 4, but could convict him for the same acts for counts 2 and 3, as the instruction is silent between those counts.

could convict Cortez for "counts two, three, and four, based on only two separate instances of molestation." But, the State argues it was "manifestly apparent" to the jury that every single incident of child molestation the State charged was a separate and distinct offense because (1) the State made this clear in its closing argument, (2) other instructions further clarified the separate and distinct nature of the incidents, and (3) Cortez himself presented the charges similarly. We agree.

First, in its closing argument, the State described each charge as a singular, separate event:

> [E]very single incident of child molestation that has been charged is a separate and distinct offense . . . each offense charged goes to a specific incident.

And the State added:

> For *count number two*, we're talking about the incidents of general touching and repeated touching that occurred at the Dashpoint apartments when she was between the ages of 9 and 10.
>
> For *count number three*, again, we're talking about the repeated and general touching that occurred in the home that she's living in now, after she moved out of the Dashpoint Apartment and into her home in 2017 where she lived all the way up until her 12th birthday and after.
>
> And *for count four*, specifically, we're talking about the incident that she told us about where she was sweeping and she felt her grandfather come up behind her and press his penis against her body.

(Emphasis added).[5] Thus, we conclude that in fact the State's closing argument

---

[5] Cortez also argues that the court's error was compounded because the State did not clearly "disclaim" reliance on other acts when it delineated which acts it would rely on for each count. However, no authority requires the State to disclaim each count *in a particular manner*. In State v. Carson, our Supreme Court concluded that the State sufficiently elected different counts when the State informed the jury in closing argument it only wanted to focus on a few events of child molestation.

"made a point to clearly distinguish between the acts that" constituted each of the three charges. Peña Fuentes, 179 Wn.2d at 825.

The court further advised the jury that the State had charged each crime in a separate count and instructed them to decide each count separately and distinctly, stating:

> A separate crime is charged in each count. You must decide each count separately. Your verdict on one count should not control your verdict on any other count.

And, the court instructed the jury that it must arrive at its verdict unanimously, stating:

> To convict the defendant on any count of child molestation in the second degree, one particular act of child molestation in the second degree must be proved beyond a reasonable doubt, and you must unanimously agree as to which act has been proved. You need not unanimously agree that the defendant committed all the acts of child molestation in the second degree.

While we are not suggesting these instructions alone would address a double jeopardy challenge, we do not consider these instructions in isolation but must view them "in light of the full record." Peña Fuentes, 179 Wn.2d at 824 (quoting Mutch, 171 Wn.2d at 661-63).

Finally, at trial, Cortez did not challenge the number of incidents or whether R.A.C. remembered when or where Cortez touched her. Rather, Cortez generally challenged R.A.C.'s credibility and asked the jury to weigh it against that of Cortez. Also, Cortez did not challenge how the State elected which act or acts

184 Wn.2d 207, 229, 357 P.3d 1064 (2015). The court held only that the State "in some way" must disclaim its intention to rely on other acts. Here, as there, the State implicitly disclaimed its reliance on some acts by affirmatively specifying which acts it was relying upon.

corresponded with each charge. On the contrary, in closing, Cortez *also* referred to each count by its corresponding event such as "two breast grabbing charges, which are counts two and three," and "this other incident where she says she was sweeping the floor." Thus, Cortez contributed to making it manifestly apparent to the jury that "the State distinguished between different geographic locations . . . and between different time periods . . . to support convictions for . . . separate charges." Daniels, 183 Wn. App. at 118.

Therefore, we do not find error because, when viewed in "light of the full record," it was manifestly apparent to the jury that each count represented a separate act. Peña Fuentes, 179 Wn.2d at 825 (citing Mutch, 171 Wn.2d at 665-66).

D.    Conditions of Community Custody

We review community custody conditions for an abuse of discretion. State v. Johnson, 197 Wn.2d 740, 744, 487 P.3d 893 (2021) (citing State v. Bahl, 164 Wn.2d 739, 753, 193 P.3d 678 (2008)). "A trial court necessarily abuses its discretion if it imposes an unconstitutional community custody condition." State v. Wallmuller, 194 Wn.2d 234, 238, 449 P.3d 619 (2019) (citing Bahl, 164 Wn.2d at 744). In such a case, "[i]ssues of statutory interpretation and constitutional law are reviewed de novo." State v. Cornwell, 190 Wn.2d 296, 300, 412 P.3d 1265 (2018).

1.  Home Searches (Condition 8)

Cortez argues that condition 8, requiring he consent to home searches, is unconstitutionally overbroad and violates his right to privacy. The State responds that the claim is not ripe. We agree with the State.

22

Our Supreme Court addressed the ripeness of an appeal of a CCO search condition of community custody in State v. Cates, 183 Wn.2d 531, 354 P.3d 832 (2015). There, the contested condition "require[d] Mr. Cates to 'consent' to searches by his CCO, merely upon the CCO's request, without specifying that the search must be based on reasonable cause." Cates, 183 Wn.2d at 535. The court considered whether further factual development was required and the risk of hardship to Cates if it declined to address the merits of his challenge at the time. Id. The condition at issue was "limited to that needed to monitor Cates' compliance with supervision." Id. The court concluded it could only examine the merits of Cates' claim if the State attempted to enforce the condition *after* Cates' release from confinement. Id. Thus, it was not ripe for a review on the merits. Id. at 536.

Conversely, in Reedy, we concluded that a similar condition requiring searches *was* ripe for review because the trial court "required" Reedy to "submit" to home visits rather than "consent" to them. State v. Reedy, No. 83039-2-I, slip op. at 25, (Wash. Ct. App. April 10, 2023) (published in part), https://www.courts.wa.gov/opinions/pdf/830392.pdf.[6] That is, in Reedy, the condition was ripe for review because the court made abundantly clear that Reedy must comply with home visits regardless of any further factual development including whether there was any evidence Reedy was violating any condition of

---

[6] "Washington appellate courts should not, unless necessary for a reasoned decision, cite or discuss unpublished opinions in their opinions." GR 14.1(c). "However, unpublished opinions of the Court of Appeals filed on or after March 1, 2013, may be cited as nonbinding authorities, if identified as such by the citing party, and may be accorded such persuasive value as the court deems appropriate." GR 14.1(a). We cite to the unpublished portion of State v. Reedy because it is the portion of the opinion that Cortez refers to in his reply brief.

custody. The trial court said:

> There's another [condition] that says you must consent to DOC home visits, but I'm going to change that, because *I don't care if you consent or not.* You must submit to DOC home visits to monitor your compliance with supervision . . . on the sentencing form the court crossed out "consent" . . . and wrote "submit."

Reedy, No. 83039-2-I, slip op. at 25 (emphasis added). This court compared the condition imposed on Reedy with that in Bahl. We concluded that the challenge in Reedy, as in Bahl, was ripe for review because the conditions would take effect as soon as he was released. Id.

But Cortez's circumstances differ because the condition is not specific enough to indicate what circumstances may later be present to justify (or not) the search. Here, the relevant condition the court imposed upon Cortez was that he must:

> Consent to DOC home visits to monitor compliance with supervision. Home visits include access for the purposes of visual inspection of all areas of the residence in which the offender lives or has exclusive/joint control/access.

The trial court otherwise did not elaborate on the nature or implementation of this condition when it imposed it.

We conclude that this case is closer to Cates than to Reedy or Bahl and hold that the condition as applied to Cortez is not ripe for review. As in Cates, the condition does not require Cortez to take a specific action upon release to comply. 183 Wn.2d at 536. We further hold that the condition is otherwise constitutional because, as in Cates, the State's authority is limited to what is necessary "to monitor [Cortez's] compliance with supervision." Id. at 535; see also Cornwell, 190 Wn.2d at 303-04 (an individual's privacy interest [in their home] can be reduced

"only to the extent necessitated by the legitimate demands of the operation of the [community supervision] process."). Thus, Cortez's claim is not ripe and "does not suffer a significant risk of hardship" if we decline to review the merits of any enforcement of condition 8 at a later time. Cates, 183 Wn.2d at 536.

2. Drug and Alcohol Testing (condition 10)

The court required Cortez to submit to alcohol and drug testing. Specifically, condition 10 required Cortez to "[b]e available for and submit to urinalysis and/or breathanalysis upon the request of the CCO and/or chemical dependency treatment provider." Cortez argues that condition 10 must be stricken because it is not crime-related under RCW 9.94A.703(3)(f).[7] We disagree.

A court must impose (unless it waives) a prohibition on the use of controlled substances. RCW 9.94A.703(2)(c). In contrast, a court *may* order an offender, as a "discretionary" condition, to not possess or consume alcohol. RCW 9.94A.703(3)(e). Additionally, the court may, as a "discretionary" condition, require an offender to comply with any "crime-related condition." RCW 9.94A.703(3)(f). And a

> "[c]rime-related prohibition" means an order of a court prohibiting conduct that directly relates to the circumstances of the crime for which the offender has been convicted, and shall not be construed

---

[7] In his reply, he argues for the first time that "the drug testing condition is unlawful because it is *unconstitutional* to impose it under these circumstances," citing to two unpublished cases, including State v. Rosales, No. 57463-2-II (Wash. Ct. App. Mar. 12, 2024) (unpublished), https://www.courts.wa.gov/opinions/pdf/D2%2057463-2-II%20Unpublished%20Opinion.pdf. (Emphasis added). And he nowhere argues it was a manifestly unconstitutional. RAP 2.5(a). Even if he had, we will not consider such arguments raised for the first time on reply, as it is too late to warrant consideration. Cowiche Canyon Conservancy v. Bosley, 118 Wn.2d 801, 809, 828 P.2d 549 (1992). We consider this claim only as a statutory challenge.

> to mean orders directing an offender affirmatively to participate in rehabilitative programs or to otherwise perform affirmative conduct. *However, affirmative acts necessary to monitor compliance with the order of a court may be required by the department*.

RCW 9.94A.030(10) (emphasis added).

Nothing in the record indicates that consumption of alcohol or drugs contributed to Cortez's convictions for child molestation in the first or second degree. But the State does not claim the conditions are crime-related. Instead, the State claims the condition is a general exercise of the Department of Corrections' monitoring powers under RCW 9.94A.703(2)(c) and (3)(e). The State is correct.

While nothing indicates that either alcohol or drugs are related to Cortez's crimes, the court is required to impose (and is thus justified in imposing) a controlled substance prohibition unless it specifically waives it under RCW 9.94A.703(2)(c). See State v. Vant, 145 Wn. App. 592, 604, 186 P.3d 1149 (2008). Therefore, we conclude the sentencing court did not abuse its discretion by imposing testing for drugs.

As to the testing for alcohol consumption, the conditions imposed are statutorily left to the broad discretion of the judge regardless of whether such abuse or use is actually crime-related. RCW 9.94A.703(3)(e). And Cortez points to nothing in the record to establish the trial court abused its discretion in a "manifestly unreasonable" manner when imposing a restriction on alcohol consumption grounded in *statutory* authority. Bahl, 164 Wn.2d at 753. In turn, "it follows . . . that the trial court's imposition of random urinalysis . . . tests to ensure compliance with its conditions does not constitute an abuse of discretion, and the condition

should remain." Vant, 145 Wn. App. at 604.

   3. Restrictions on Romantic and Dating Relationships (condition 5)

   Condition 5 requires Cortez to:

   Inform the supervising CCO and sexual deviancy treatment provider
   of any dating relationship. Disclose sex offender status prior to any
   sexual contact. Sexual contact in a relationship is prohibited until the
   treatment provider approves of such.

   Cortez argues the condition is invalid because it is not crime-related and it interferes with his constitutional right to marry and to "engage in sexually intimate activity with another person within the home." He also argues the condition hinders his constitutional right to freedom of speech, including "the right not to speak the State's message" by disclosing his status as a sex offender.

   We reviewed a similar condition of community custody in Gantt, recounting:

   This condition contains three parts. It requires Gantt to (1) inform the
   supervising community corrections officer (CCO) of any "dating
   relationship," (2) disclose his sex offender status prior to any sexual
   contact, and (3) receive approval from his treatment provider before
   engaging in any sexual contact.

Gantt, 29 Wn. App. 2d at 455-56.

   "[T]his court has upheld [similar] disclosure requirements as they protect individuals 'by providing them with knowledge of the potential risk he presents to minors' and [to] 'make it possible for [the] CCO and treatment provider to take whatever additional steps . . . to protect anyone embarking on a dating or sexual relationship with [the offender].'" Id. at 456-57 (some alterations in original) (quoting In Re Pers. Restraint of Sickels, 14 Wn. App. 2d 51, 60-61, 469 P.3d 322 (2020)). "The requirement for treatment provider approval is 'common for sexual

offenders' as 'the offender's freedom of choosing even adult sexual partners is reasonably related to their crimes because potential romantic partners may be responsible for the safety of live-in or visiting minors.'" Id. (quoting Sickels, 14 Wn. App. 2d at 61). Accordingly, we conclude Cortez's challenge fails.

E.     Legal Financial Obligations

Cortez argues that we should remand to strike the DNA fee and Victim Penalty Assessment (VPA). The State does not object to a limited remand for this purpose.

In 2023, our legislature amended RCW 7.68.035 to state that "[t]he court shall not impose the penalty assessment under this section if the court finds that the defendant, at the time of sentencing, is indigent as defined in RCW 10.01.160(3)." LAWS OF 2023, ch. 449, § 1; RCW 7.68.035(4). Further, courts now are statutorily required to waive VPAs, even those imposed prior to the 2023 amendments, on the defendant's motion. Id.; RCW 7.68.035(5)(b).

Similarly, our legislature also amended statutes governing DNA collection fees, eliminating the fee for all defendants. LAWS OF 2023, ch. 449, § 4. Further, courts are required to waive any DNA collection fee imposed prior to the 2023 amendments, on the offender's motion. Id.; RCW 43.43.7541(2).

Here, the court imposed a fee of $500 for the VPA and of $100 for a DNA collection fee in December 2022. But, the court also found that Cortez was indigent. In State v. Ellis, this court determined that, although the fees were imposed prior to the effective date of these amendments, "it applies to Ellis because this case is on direct appeal." 27 Wn. App. 2d 1, 16, 530 P.3d 1048

28

(2023). Similarly, even though Cortez's restitution was set in 2022, RCW 9.94A.753(3)(b) is effective because his case is on direct appeal.

Thus, we accept the State's concession and remand this matter to the court to strike the VPA and DNA fees.

III.     CONCLUSION

We affirm each of Cortez's convictions and each condition of community custody, but remand this matter to the trial court solely to strike the VPA and DNA fees.

Díaz, J.

WE CONCUR:

Coburn, J.                    Dwyer, J.